*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, e-mail corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| SHERMAN B., | ) | |
| | ) | Supreme Court No. S-14957 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-12-00028  CN |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF HEALTH | ) | No. 6833 - October 11, 2013 |
| AND SOCIAL SERVICES, | ) | |
| OFFICE OF CHILDREN'S | ) | |
| SERVICES, | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, William F. Morse, Judge.

Appearances: Glenda J. Kerry, Law Office of Glenda J. Kerry, Girdwood, for Appellant.  Julia B. Bockmon, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.  Lisa Wilson, Assistant Public Advocate, and Richard Allen, Public Advocate, Anchorage, Guardian Ad Litem.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen and Bolger,  Justices.

MAASSEN, Justice.

# I. INTRODUCTION

The subject of this appeal is the termination of Sherman B.'s parental rights to his son Kadin M.[1] The Office of Children's Services (OCS) took Kadin into custody soon after his birth because he and his mother, Amy M., both tested positive for cocaine, and because of concerns about both parents' ability to care for the child. OCS had already been involved with Sherman for several years because of concerns with his other three children. The superior court terminated both Sherman's and Amy's parental rights to Kadin in October 2012. Sherman appeals, contesting the court's findings that he abandoned Kadin, that he failed to remedy the conduct that caused Kadin to be a child in need of aid, that OCS made reasonable efforts to reunify the family, and that termination of his parental rights is in Kadin's best interests. We affirm.

# II. FACTS AND PROCEEDINGS

## A. OCS's Involvement With Sherman's Parenting Of His Other Children

Sherman and Amy had an on-and-off relationship for a number of years. Their daughter Georgina was born cocaine-positive in 2007. OCS became involved with the family as a result and created a parenting plan, which required, among other things, that Sherman not leave Georgina alone with Amy. Sherman appears to have been Georgina's primary caregiver initially, as Amy was often using drugs. But when Georgina was somewhere between eight and fourteen months old, Sherman left her in Atlanta with relatives, who eventually moved her to New York to live with Sherman's aunt. Sherman did not visit Georgina between December 2008 and March 2011, and their contact was limited to phone calls.

---

[1] We use pseudonyms for all family members to protect their privacy.

Amy gave birth to another child, Darcy, in 2009. Although Amy told Sherman she was pregnant and that he might be the father, he was uninvolved during the pregnancy and was working in Whittier when Darcy was born. When Darcy tested positive for cocaine, OCS took custody of her and placed her with Amy's mother. Sherman became involved in Darcy's life only after OCS facilitated a paternity test that confirmed he was her father. He visited her on a weekly basis, but his relationship with her remained somewhat distant, and he voiced his preference that she live with his aunt and Georgina in New York.

In 2010 Sherman had another child, Khloe, with a different woman. OCS immediately opened a child-in-need-of-aid (CINA) case for Khloe and placed her with foster parents.

OCS identified a number of concerns with Sherman's parenting of both Darcy and Khloe, including his ability to maintain housing and to provide financial support through either employment or public assistance. OCS had reservations as well about his ability to understand child development sufficiently to act as a responsible parent. Also of concern to OCS was the fact that he had been arrested twice, in 2009 and 2010, on drug-related charges, though neither arrest resulted in a conviction.

Sherman completed a parenting class at Fathers Insync in July 2010. During the fall of 2010 OCS started unsupervised visits with Darcy and Khloe in Sherman's home and was considering reunification. Sherman was showing improvement. A Team Decision Meeting was planned for March 2011 to discuss a trial home visit with Darcy. But the situation changed in mid-March after Sherman's aunt in New York filed for custody of Georgina, and Sherman traveled to New York, where a court hearing had been scheduled to consider his aunt's petition. Sherman appeared unannounced at his aunt's home and over her objections took Georgina away, though

Georgina had not seen him for several years and did not recognize him. He returned Georgina two days later pursuant to a court order.

Sherman was in New York for about five weeks, and during that time he lost his housing in Anchorage. While he was gone, OCS discovered that he had been allowing Khloe's mother, who had untreated substance abuse issues, to attend the unsupervised visits with Khloe and Darcy. OCS accordingly switched back to supervised visits once Sherman returned to Alaska. The visits did not go well. OCS caseworker Leslie Johnston later testified that Khloe would cry and scream throughout the visits and Sherman would not accept any help in dealing with her distress. Sherman partly blamed the OCS workers, who he claimed aggravated the situation by yelling at him to make Khloe stop crying.

Sherman went back to New York in August 2011 for Georgina's custody trial. The New York court found that Sherman had "demonstrated a complete insensitivity" to Georgina's needs by forcibly removing her from his aunt's home after not having seen the child for years. The court concluded that Sherman's behavior "demonstrated such incredibly poor parental judgment as to have the court question his fitness to be responsible for any child." The New York court granted sole legal and physical custody of Georgina to Sherman's aunt.

Around the time that Sherman made this second trip to New York, OCS moved visitation with Darcy and Khloe to Cook Inlet Tribal Council at Sherman's request. But visitation with Khloe continued to be difficult in the new setting. During one visit, according to the visitation supervisor's paraphrase of Sherman's remarks, Sherman thought that an inconsolable Khloe "just needs to cry until she breaks" and "just needs to be broke." In the fall of 2011 the superior court ordered that Sherman's

visitation with Khloe be halted until he took a psychological assessment. Sherman refused to take the assessment and as a result had no further visitation with Khloe.

Darcy's and Khloe's cases both ended in the termination of Sherman's parental rights. The superior court terminated Sherman's rights to Darcy on January 6, 2012, and we affirmed that decision on appeal.[2] Sherman's appeal of the termination in Khloe's case is pending.

## B. Kadin

Sherman and Amy's son Kadin was born on February 4, 2012, shortly after the termination of Sherman's parental rights to Darcy. Kadin tested positive for cocaine at birth, later experiencing some adverse physical effects from this exposure. OCS took emergency custody of Kadin at the hospital. Sherman objected to this; he asserted that he should be allowed to take Kadin home as he had Georgina, who had also been born cocaine-positive. Sherman and Johnston, the social worker, later described their interactions at the hospital as contentious; at one point Johnston called security and Sherman called the police. OCS placed Kadin with Amy's mother, who was already caring for Darcy.

On February 28, about three weeks after Kadin's birth, OCS moved in superior court for a determination that it did not need to make reasonable efforts towards Kadin's reunification with Sherman, as generally mandated by AS 47.10.086(a). OCS relied on AS 47.10.086(c)(8), which excuses "reasonable efforts"

> if the court has found by clear and convincing evidence that the parental rights of the parent have been terminated with respect to another child because of child abuse or neglect, the parent has not remedied the conditions or conduct that led to

---

[2] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421 (Alaska 2012).

the termination of parental rights, and the parent has demonstrated an inability to protect the child from substantial harm or the risk of substantial harm.

OCS contended that Sherman had not remedied his conduct "[i]n the short time since [Darcy's] trial" and that "his disinterest in [day-to-day parenting] means that he lacks an ability to perceive and appropriately respond to the emotional needs of a child, which would cause [Kadin] substantial harm."

The court did not rule on OCS's motion immediately, and OCS eventually withdrew it. In the meantime, OCS proceeded with case planning. Johnston later testified that both Sherman and Amy refused to discuss case planning with her during their initial meeting in March 2012. Amy did state, however, that she intended to go to New York to get Georgina, a plan that Sherman favored. According to Johnston, Sherman "didn't seem to understand or care that his aunt was granted sole legal custody of [Georgina], and it is in her best interest to remain . . . [in] the only home that she knows." Case plans from March and April 2012 called for Sherman to engage in visitation with Kadin, maintain housing and employment, provide OCS with information about his housing and employment, work on his understanding of child development, take a psychological assessment, and attend monthly case planning meetings.

On May 10, 2012, OCS petitioned for the termination of Sherman's parental rights to Kadin, arguing that Sherman had caused Kadin to be a child in need of aid through neglect and abandonment. On the same day, OCS also moved for an order requiring Sherman to undergo a psychological evaluation. OCS's primary rationale was that, given OCS's difficulties in working with Sherman and his past inability to change his behaviors, "[a] psychological evaluation is the best chance of determining what, if any, services could possibly help [Sherman] retain custody of [Kadin]." In June 2012 the superior court granted the motion, finding that Sherman's mental state was in

controversy and that there was good cause for a psychological evaluation. Sherman refused to comply.

Sherman did participate in visitation twice a week at OCS from the time Kadin was born until June or July 2012. He then left for Kenai or King Salmon, informing OCS that he was going to work in the seafood industry during fishing season and would travel back to Anchorage for weekly visitation.[3] He did not return to Anchorage for about a month, at which time OCS changed the regular visitation schedule to once a week.

The termination trial was held in October 2012. Sherman and Amy were both represented by counsel. After hearing the evidence the superior court terminated both Amy's and Sherman's rights, finding that Amy placed Kadin in need of aid due to her cocaine use during pregnancy and that Sherman placed Kadin in need of aid due to abandonment. Sherman appeals the court's findings that (1) he caused Kadin to be a child in need of aid; (2) he failed to remedy the conduct or conditions that placed Kadin in need of aid; (3) OCS provided reasonable reunification efforts; and (4) termination was in Kadin's best interests.[4]

---

[3]      Johnston expressed some doubt as to whether Sherman actually went out of town during this period, testifying that she saw him in the OCS lobby after he had canceled a visit and said he was going to Kenai.

[4]      We recently decided Amy's appeal from the same order. *Amy M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, ___ P.3d ___, Op. No. 6820, 2013 WL 4768382 (Alaska, Sept. 6, 2013).

## III.   STANDARD OF REVIEW

Whether a child is in need of aid,[5] whether a parent has remedied the conditions that placed the child in need of aid,[6] and whether termination is in a child's best interests[7] are factual determinations. We review factual findings in child-in-need-of-aid cases for clear error.[8] "Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party below leaves us with a definite and firm conviction that a mistake has been made."[9] "Generally, conflicting evidence is insufficient to overturn the superior court's decision, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[10] We give deference to the superior court's credibility assessments, especially when such

---

[5]    *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011) (citing *T.B. v. State*, 922 P.2d 271, 273 (Alaska 1996)).

[6]    *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1103-04 (Alaska 2011) (quoting *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010)).

[7]    *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 962 (Alaska 2013) (citing *Pravat P.*, 249 P.3d at 270).

[8]    *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 930 (Alaska 2012) (citing *Christina J.*, 254 P.3d at 1103).

[9]    *Pravat P.*, 249 P.3d at 269-70 (quoting *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 209-10 (Alaska 2010)) (internal quotation marks omitted).

[10]    *Hannah B.*, 289 P.3d at 930 (citing *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

assessments are based on oral testimony.[11]  Whether OCS has made reasonable reunification efforts is a mixed question of law and fact.[12]  "Whether the superior court's factual findings satisfy applicable child in need of aid (CINA) statutes and rules is a question of law that we review de novo."[13]

## IV.  DISCUSSION

### A.  Legal Framework

To terminate parental rights, the superior court must make four findings.[14] First, the court must find by clear and convincing evidence that the child "has been subjected to conduct or conditions described in AS 47.10.011" and is thus in need of aid.[15]  Second, the court must find by clear and convincing evidence that the parent has failed to remedy the conduct and conditions in a timely manner such that the child would be at risk of physical or mental injury if returned to the parent.[16]  Third, the court must find by clear and convincing evidence that OCS has made reasonable efforts, pursuant

---

[11]     *Id.* (citing *Pravat P.*, 249 P.3d at 274).

[12]     *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 428 (Alaska 2012).

[13]     *M.W. v. State, Dep't of Health & Soc. Servs.*, 20 P.3d 1141, 1143 (Alaska 2001).

[14]     CINA Rule 18(c); AS 47.10.080(c)(3).

[15]     AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

[16]     CINA Rule 18(c)(1)(A)(i)-(ii).

to AS 47.10.086, in support of reunification.[17]  Fourth, the court must find by a preponderance of the evidence that termination is in the child's best interests.[18]

**B.  The Superior Court Did Not Err In Finding That Kadin Was A Child In Need Of Aid.**

Sherman contests the superior court's finding that he caused Kadin to be a child in need of aid through abandonment.[19]  "We have articulated a two-part test for reviewing cases of abandonment: (1) [t]here must be parental conduct evidencing a willful disregard for parental obligations, leading to (2) the destruction of the parent-child relationship."[20]  This test is objective, focusing on the parent's demonstrated actions rather than subjective intent.[21]  Abandonment may also be found if the parent, without justifiable cause, "failed to participate in a suitable plan or program designed to reunite

---

[17]     AS 47.10.088(a)(3); CINA Rule 18(c)(2).

[18]     AS 47.10.088(c); CINA Rule 18(c)(2)(A).

[19]     Sherman also argues that "[w]hen both parents are available, the State must prove that each parent is unfit before it may interfere with the family."  But we have held that an initial determination of CINA status may be "based on the acts of just one parent." *Jeff A.C., Jr. v. State*, 117 P.3d 697, 703 (Alaska 2005).  And a parent's conduct that is found to have placed the child in need of aid for purposes of termination proceedings need not be the same conduct that originally caused the State to seek custody.  *Id.*  Here, the superior court properly focused on Sherman's abandonment despite the fact that Amy's drug use was a primary factor prompting State intervention.

[20]     *Sean B. v. State, Dep't of Health & Social Servs., Office of Children's Servs.*, 251 P.3d 330, 335 (Alaska 2011) (alteration in the original) (quoting *Rick P. v. State, Office of Children's Servs.*, 109 P.3d 950, 957 (Alaska 2005)) (internal quotation marks omitted).

[21]     *Id.* at 335-36 (quoting *Jeff A.C., Jr.*, 117 P.3d at 704).

the parent . . . with the child."[22]  The superior court in this case found that Sherman abandoned Kadin both under the general, two-part test and by failing to participate in his case plan.

We first considered what is meant by the statutory phrase "failed to participate" in a case plan in *A.B. v. State*.[23]  "While [AS 47.10.103(a)] does not necessarily require a parent to follow his or her reunification plan to the letter, it does require more than minimal participation."[24]  The record in this case supports a finding that Sherman failed to comply with several important aspects of his case plan, including undergoing a psychological assessment, providing verification of his housing and employment, and gaining an understanding of Kadin's developmental needs and abilities.

OCS arranged for Sherman to undergo a psychological evaluation with the purpose of learning how to better educate him about being a responsible parent, given its history with him and its past inability to effect his reunification with his other children.  Sherman refused to undergo the evaluation, even after the court ordered that he do so.  Sherman admits this failure on appeal, though he argues that he had a right to refuse and that he justly suspected that the ordered evaluation was "nothing but a fishing expedition because he had already proved that he was safe with the children."  But the record amply supports OCS's concerns and its need for better communication with him; it also amply supports the superior court's conclusion that Sherman's refusal to undergo the evaluation even when ordered to do so was objective evidence of an unjustified failure to participate in the case plan.

---

[22]    AS 47.10.013(a)(4).

[23]    7 P.3d 946, 951 (Alaska 2000).

[24]    *Id.*

With regard to other requirements of the case plan, Sherman contends that the superior court clearly erred in finding that he "refuse[d] to show [OCS] how he earned money or where he lived." Johnston testified at the evidentiary hearing that it was important for OCS to know about Sherman's sources of income because they needed to formulate a plan for him to take care of Kadin and because OCS was concerned that Sherman might be supporting himself by dealing drugs. Johnston testified that Sherman had not shown any proof of income after Kadin's birth despite his claims that he sometimes worked in the fishing industry and that he owned a seafood business. The superior court methodically but with little success asked Sherman to describe his recent employment history. Sherman testified that he had held a few temporary jobs shortly before and after Kadin was born, that he had set up a seafood business, and that he was currently getting help with food, clothes, and rent from a housing assistance program. He testified that he had not filed a tax return since before 2001 but could not explain why not. His testimony about his earnings overall was confused, inconsistent, and contradictory and supported Johnston's testimony that he was less than forthcoming. Giving the required deference to the superior court's determinations of credibility,[25] we cannot say that the court clearly erred in finding that Sherman failed to participate in the case plan by refusing to inform the State about his sources of income.

The same is true of Sherman's housing. He contends in part that the superior court inappropriately focused on its quality. The governing statute provides that "the court may not find a minor to be a child in need of aid . . . solely on the basis that the child's family is poor, lacks adequate housing, or exhibits a lifestyle that is different

_____

[25]    *See Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*,  289 P.3d 924, 930 (Alaska 2012) (citing *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 274 (Alaska 2011)).

from the generally accepted lifestyle standard of the community where the family lives."[26] But the superior court here focused not on the quality of the housing but on Sherman's secretiveness about it, a matter which was of significant concern to OCS.

At the time of Kadin's birth, Sherman was living in a rooming house, but he soon moved someplace else. He testified that he asked Johnston to conduct home visits at both locations but she refused to do so. Johnston conceded at trial that Sherman asked her to conduct a home visit at the rooming house, but she testified that when she was available to do it he was no longer receptive. She testified that he refused to reveal the address where he lived next, and that she was eventually unable to make any further inquiry into his housing situation because he stopped coming to case planning meetings. It may be that some of the resistance OCS encountered was due to communication difficulties. But once more giving the required deference to the superior court's determinations of credibility,[27] we cannot say that the court clearly erred in finding that Sherman failed to participate in the case plan by refusing to give OCS the information it needed about his housing.

Sherman also contests the court's finding that he "exhibited no significant understanding of [Kadin's] developmental needs or abilities," which marked a failure to meet one of the important goals of his April 2012 case plan. Sherman argues that the examples cited by the superior court — his belief that Kadin could hold his head up and recognize faces at five days old and his misidentification of Darcy's age in a photograph — "do not involve the type of weighty justification needed to support a

---

[26]    AS 47.10.019.

[27]    *See Hannah B.*, 289 P.3d at 930 ("We defer to a superior court's credibility determinations, particularly when they are based on oral testimony." (citing *Pravat P.*, 249 P.3d at 274)).

finding that one has abandoned his child." We agree that these instances alone would be insufficient to justify such a finding, but the court specifically cited them as examples of a wider problem. And it is unnecessary for us to decide whether the court erred in making this finding. Even disregarding Sherman's failure to make progress on the child development issue, there is no clear error in the superior court's finding that Sherman failed, without justification, to participate in his case plan by refusing to take the court-ordered psychological evaluation and refusing to disclose information about his income and housing.[28]

We also cannot say that the superior court clearly erred in finding that Sherman abandoned Kadin under the general, two-part test. Sherman's failure to take the actions necessary to improve his chances of success in his relationship with Kadin constitutes (1) "parental conduct evidencing a willful disregard for parental obligations, leading to (2) the destruction of the parent-child relationship."[29] This is especially true given past events. Sherman's rights to Darcy had been terminated just months before for reasons very much like those at issue here; yet Sherman was unable to show that he was

---

[28] Sherman also argues that the record provides no support for the superior court's conclusion that his visits with Kadin were "rather superficial." He correctly points out that Johnston testified that his behavior with Kadin during visitation was "fine." Yet we find persuasive OCS's argument that the court found the visits to be superficial because of Sherman's failure to make other changes in his life that would increase his contact with Kadin and lead to reunification.

In addition, Sherman contends that "the court inappropriately used [his] hostility to OCS to determine that he was not fit to parent." But the court's finding was properly focused on Sherman's relationship with Kadin; the court found that Sherman's hostility to OCS was not an excuse for his failure to be more involved with the child.

[29] *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 251 P.3d 330, 335 (Alaska 2011) (quoting *Rick P. v. State, Office of Children's Servs.*, 109 P.3d 950, 957 (Alaska 2005)) (internal quotation marks omitted).

seriously interested in addressing the reasons for that termination and working toward a better result this time.

### C. The Superior Court Did Not Err In Finding That Sherman Failed To Remedy The Conditions That Placed Kadin In Need Of Aid.

Sherman challenges the superior court's finding that he did not remedy the conditions that placed Kadin in need of aid. Before terminating parental rights, the court must find by clear and convincing evidence that the parent "has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury."[30] In determining whether a parent has remedied the relevant conduct or conditions, the court may consider the best interests of the child.[31] A failure to comply with a case plan may constitute a failure to remedy.[32]

Sherman argues that he met all the requirements of his case plan except for the psychological evaluation, which, he contends, OCS failed to show was really needed. However, OCS presented reasonable justifications for the evaluation, including Sherman's troublesome conduct with Georgina in New York, the difficulty that social service providers had in trying to work with him, and the fact that he was barred from visitation with Khloe until an evaluation was completed. Furthermore, as discussed in Section IV.B. above, the superior court did not err in finding that Sherman failed to comply with other aspects of his case plan, namely informing OCS about his housing and

---

[30] AS 47.10.088(a)(2)(B); *see also* CINA Rule 1.8(c)(1)(A)(i)-(iii).

[31] AS 47.10.088(b).

[32] *See Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008).

employment situation. The court's conclusion that Sherman failed to remedy the conduct that led to the finding of abandonment is not clearly erroneous.

### D. The Superior Court Did Not Err In Finding That OCS Made Reasonable Reunification Efforts.

Sherman challenges the superior court's finding that OCS made reasonable efforts to reunify him and Kadin. In order to facilitate reunification, OCS must "make timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed to . . . enable the safe return of the child to the family home, when appropriate, if the child is in an out-of-home placement."[33] OCS must identify relevant support services that may aid the parent in remedying the relevant conduct or conditions and must actively help the parent to obtain those services.[34] OCS may fulfill this obligation "by setting out the types of services that a parent should avail . . . herself of in a manner that allows the parent to utilize the services."[35] "[OCS] has some discretion both in determining what efforts to pursue and when to pursue them."[36]

On appeal, Sherman emphasizes the fact that it was just three weeks after Kadin's birth that OCS asked for a determination that no reasonable efforts were needed, and that OCS filed for termination when Kadin was just three months old. He argues that

---

[33]    AS 47.10.086(a).

[34]    *Id*.

[35]    *Tara U. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 239 P.3d 701, 705 (Alaska 2010) (quoting *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003)) (internal quotation marks omitted).

[36]    *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 432 (Alaska 2012) (citing *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 251 P.3d 330, 338 (Alaska 2011)).

the timing of these actions, along with the fact that OCS was concurrently completing a home study for a possible adoption by Amy's mother, prove that OCS never considered reunification to be a "true goal." He also argues that the superior court improperly placed the burden of reunification on him. OCS responds that its efforts were reasonable given its history with Sherman and his unwillingness to cooperate.

The superior court found this to be a close case, and it observed that the compressed time frame would have precluded any finding of reasonable efforts if it were not for Sherman's recent history with OCS. The court explained that

> [t]he very recent behavior of [Kadin's] parents in regards to [Darcy] gives meaning and context to their behavior towards [Kadin] during his life so far and is evidence of how they would likely behave in the near future. It also informs the experience of [OCS] and helps define what efforts it must reasonably make to provide family support services to the parents.

It is true that "[t]he reasonableness of the division's efforts . . . must be viewed in light of the entire history of services that [OCS] had already provided."[37] We have previously held "that '[OCS's] efforts to prevent breakup of the entire family' may be considered 'in assessing whether that effort was sufficient' with respect to a particular child."[38]

Johnston, the OCS caseworker, testified that during Darcy's and Khloe's cases OCS provided Sherman with information about public assistance and food stamps and that her predecessor at OCS had helped Sherman complete a parenting class by working with the class facilitator after Sherman was almost discharged for non-

---

[37]    *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 66 P.3d 1, 7 (Alaska 2003) (citing *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002)).

[38]    *Id.* at 8 (quoting *E.A.*, 46 P.3d at 991).

attendance. OCS had arranged supervised visitation between Sherman and his daughters Darcy and Khloe and had made a number of efforts to address difficulties that arose during those sessions. First, OCS workers tried to help Sherman deal with Khloe's distress during visitation, but he was not receptive and would ask them to leave. Second, OCS moved visitation to Cook Inlet Tribal Council at Sherman's request. Third, Johnston arranged for Sherman to work with a parenting coach at Alaska Youth and Family Network after he asked for additional help with the visits. But Sherman refused to take the parenting classes that the program required, claiming that he had already learned all he needed to know. He also refused to engage with a staff member from the Father's Journey parenting program who came to speak with him about taking part in a fathers' group.

The record supports a finding that OCS continued to make reunification efforts after Kadin was born. OCS provided supervised visitation with Kadin twice a week until Sherman's summer trip to Kenai or King Salmon in 2012, after which the visits decreased to once a week (apparently due to scheduling problems). Johnston held a case planning meeting in March 2012, scheduled two other planning meetings which Sherman did not attend, and attempted to speak with Sherman on the phone. OCS provided Sherman with a bus pass every month. Finally, OCS set up the court-ordered psychological evaluation which Sherman refused to attend — as he had with the evaluation scheduled before Kadin's birth.[39]

---

[39] We note that a court may determine that reasonable efforts are no longer required if the court finds that "the parent has . . . failed to comply with a court order to participate in family support services." AS 47.10.086(c)(3). OCS apparently did not ask the superior court to make such a finding in this case.

In evaluating whether OCS has made reasonable efforts, the court should "look at . . . the parent's level of cooperation with OCS's efforts."[40] In *E.A. v. State*, we concluded that while OCS's efforts during the latter part of the case "consisted largely of failed attempts to contact [the mother] or obtain information from her rather than the provision of services, [the mother's] evasive, combative conduct rendered provision of services practically impossible."[41] The mother's antagonistic conduct included withholding contact information, being verbally abusive toward the social worker, and failing to complete a substance abuse assessment.[42] The facts are similar here. The evidence supports the superior court's conclusion that Sherman was both confrontational and secretive in his dealings with OCS. Johnston testified that Sherman refused to discuss case planning with her during the March 2012 meeting; that he failed to come to the next two planning meetings she scheduled with him; and that when she tried calling him, their conversations were not productive or he would hang up on her. Johnston testified that Sherman had been uncooperative with OCS prior to Kadin's case and that he had threatened her and other OCS workers. His lack of candor with regard to his housing and sources of income have already been detailed above and also find support in the record.

It is true that reunification efforts after Kadin's birth took place over a short period of time, and that visitation was sometimes reduced partly because of OCS's limitations. However, "[t]he efforts that OCS makes must be reasonable but need not be

---

[40]     *Tara U.*, 239 P.3d at 705 (citing *Burke P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 162 P.3d 1239, 1245 (Alaska 2007)).

[41]     *E.A.*, 46 P.3d at 990.

[42]     *Id.* at 990 n.12.

perfect."[43] OCS provided — or attempted to provide — a number of services to Sherman over the course of its history with him and tried different tactics to engage with him both before and after Kadin's birth. The superior court did not clearly err in finding that OCS's efforts toward reunification were reasonable.[44]

E. **The Superior Court Did Not Err In Finding That Termination Of Sherman's Parental Rights Was In Kadin's Best Interests.**

Sherman challenges the superior court's finding that termination is in Kadin's best interests. Under AS 47.10.088(c) and CINA Rule 18(c)(3), before a court terminates parental rights it must find by a preponderance of the evidence that termination is in the best interests of the child. It is "proper to consider the children's bond to their caregivers, their need for permanency and stability, and the potential risk to the children if returned to their parent's care."[45] "[A] child's need for permanence and stability should not be put on hold indefinitely while the child's parents seek to rectify the circumstances that cause their children to be in need of aid."[46] The record supports the superior court's determination that it was unlikely Sherman would be able to rectify

---

[43] *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 933 (Alaska 2012) (quoting *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 678 (Alaska 2008)) (internal quotation marks omitted).

[44] We note that this may have been an appropriate case for the application of AS 47.10.086(c)(8), which excuses OCS from making further reasonable efforts towards reunification if an earlier case has demonstrated that the efforts are likely to fail. OCS withdrew its request that the statute apply to this case before the trial court could rule on it, so this issue is not before us.

[45] *Hannah B*, 289 P.3d. at 933 (citing *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 850-51 (Alaska 2009)).

[46] *Kent V. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 233 P.3d 597, 603 (Alaska 2010).

his behavior in the near future, that Kadin had formed bonds in his new household with his grandmother and his sister Darcy, and that his grandmother was meeting his needs for permanence and security.

Sherman contests several of the court's specific findings, including its conclusion that he has never shown a "real desire to care for a child." For support, he points to his care of Georgina during her first nine months and his regular visitation with Darcy. But these actions must be viewed in light of his placement of Georgina with relatives in Atlanta and New York and his lack of substantive contact with her thereafter; his initial preference that Darcy be sent to New York as well; and the difficulties he experienced with visitation, difficulties that he failed to surmount despite OCS's efforts. Given this history, we cannot say that the superior court erred in finding that "[Sherman's] claims to be motivated to care for [Kadin] are not credible."

Sherman also faults the superior court for failing to specify the type of emotional harm to which Kadin would be exposed if he were in Sherman's care. But the risk of emotional harm follows logically from the court's other more specific findings about Sherman's repeated failure to show consistent interest in his children, growth in his parenting abilities, and commitment to a case plan. We see no error in the court's conclusion that terminating Sherman's parental rights was in Kadin's best interests.

## V.  CONCLUSION

We AFFIRM the superior court's decision terminating Sherman's parental rights to Kadin.