**NOTICE**

*Memorandum decisions of this court do not create legal precedent.  A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| MAXINE B., ) | |
| ) | Supreme Court No. S-19470 |
| Appellant, ) | |
| ) | Superior Court Nos.: |
| v. ) | 1JU-23-00016/00017 CN |
| ) | (Consolidated) |
| STATE OF ALASKA, DEPARTMENT ) | |
| OF FAMILY & COMMUNITY ) | MEMORANDUM OPINION |
| SERVICES, OFFICE OF CHILDREN'S ) | AND JUDGMENT* |
| SERVICES, ) | |
| ) | No. 2143 – April 22, 2026 |
| Appellee. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Larry R. Woolford, Judge.

Appearances:  Chris Peloso, Law Offices of Chris Peloso, Juneau, for Appellant.  Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Stephen J. Cox, Attorney General, Juneau, for Appellee.

Before:  Borghesan, Henderson, Pate, and Oravec, Justices. [Carney, Chief Justice, not participating.]

## I.    INTRODUCTION

The superior court terminated a mother's parental rights after finding that she posed a substantial risk of harm to her child due to her alcohol abuse.  The court

---

\*        Entered under Alaska Appellate Rule 214.

found by clear and convincing evidence that the Office of Children's Services (OCS) had made reasonable efforts to offer the mother rehabilitative services designed to help her become a safe parent. But it found that despite these efforts, the mother failed to remedy her alcohol abuse within a reasonable time, so it was in the child's best interests to terminate her parental rights. The mother appeals the termination order. She challenges the court's rulings that OCS made reasonable efforts and that she failed to remedy her conduct. We see no error in these rulings and affirm the termination order.

## II. FACTS AND PROCEEDINGS

### A. Initial OCS Involvement

Maxine B. is the mother of Duffy, who was 12 years old when the termination order was issued.[1] In late 2022 OCS received reports of harm involving Maxine and her children that led OCS to investigate. In January 2023, following a report that Maxine had, while intoxicated, assaulted another family member in Duffy's presence, OCS obtained Maxine's agreement to an out-of-home safety plan. This plan required Maxine to leave the family home, with Duffy remaining there in the care of his adult brother. OCS's concerns persisted, and it petitioned to adjudicate Duffy a child in need of aid in March 2023. The petition was granted, and in May or June 2023 OCS removed Duffy from the home and placed him with his paternal grandfather.

### B. Reunification Efforts

OCS started making efforts to help the family in connection with the January 2023 safety plan. The plan identified concerns about Maxine drinking to intoxication and the resulting violent altercations. The initial caseworker offered help with transportation, gave Maxine applications for substance abuse treatment, and referred her to a mental health provider for a behavioral assessment. Despite these efforts, Maxine did not enter into treatment programs or complete an assessment.

---

[1] We use pseudonyms to protect the family's privacy. Additionally, we note that Maxine has children other than Duffy who are not involved in this case.

OCS assigned a primary caseworker to the family in May 2023. He developed a case plan for Maxine. The case plan prescribed three activities for Maxine: participate in monthly meetings with her caseworker, meet with her caseworker to develop an individualized plan, and obtain a comprehensive behavioral assessment and follow any resulting recommendations. It also instructed Maxine to work with OCS to create a child visitation schedule, maintain safe and stable housing, and attend a parenting class. OCS referred her to a clinic offering the parenting class and offered her rides to receive a behavioral assessment. OCS updated the case plan in March 2024 to require Maxine to complete random urinary analyses (UA).

Maxine never completed the recommended assessment. She also did not complete any drug or alcohol testing. A service provider called Maxine to set up her participation in parenting classes. But Maxine did not participate.

OCS regularly attempted to maintain contact and schedule check-in meetings with Maxine through text messages. It also sent mail to Maxine's mother's address, where Maxine had told OCS she would receive mail. Over the nearly two years that the case was active, Maxine met with her caseworker only three times: in August 2023, October 2023, and August 2024.

OCS also attempted to set up visitation between Maxine and Duffy but was unable to do so. Maxine sometimes visited Duffy informally, but Duffy's grandfather would allow these visits only when Maxine was not intoxicated.

In March 2024 OCS submitted a request under the Interstate Compact for the Placement of Children to place Duffy with his paternal grandmother in Kentucky. Maxine sought to have Duffy placed instead with one of her older sons who was serving in the military and living on base. OCS investigated this possibility but ultimately determined that placing Duffy with his grandmother in Kentucky would afford Duffy more stability. Duffy's paternal grandfather was also moving to Kentucky near the grandmother, affording Duffy continuity.

## C.    Termination Trial And Order

In October 2024 OCS petitioned to terminate Maxine's parental rights.[2] The superior court held a termination trial over two days in March and April 2025. The court heard testimony from OCS caseworkers and from Maxine.

The initial caseworker testified about her contact with the family in late 2022, which led to the out-of-home safety plan. She described the efforts she made to engage Maxine in services.

The primary caseworker also testified. He described mailing letters to Maxine and communicating with her by text message; this testimony was supported by a 40-page exhibit documenting their text messages. He testified to creating case plans for Maxine without her input because she did not attend their scheduled meetings. He also testified that despite scheduling check-in meetings with Maxine every month since he became the family's primary caseworker, Maxine had attended only three meetings.

The caseworker further testified that Maxine had not completed any classes or assessments since OCS became involved with the family. He described attempting to persuade her to obtain a behavioral assessment and to take parenting classes "without overwhelming her with any other services." He explained that he planned to better tailor her case plan once he had a better understanding of her needs.

He testified that he made several attempts to set up visitation throughout the case, but had been unable to do so because Maxine had not met with him to discuss the visitation guidelines. He was aware that visitation outside of OCS channels had been occurring but was unsure how frequently.

Maxine also testified. She told the court that when OCS first contacted her in September 2022, she was homeless and her children were living with her mother.

---

[2]    OCS also petitioned to terminate the parental rights of Duffy's father. His parental rights are not at issue in this appeal.

She testified about her incarceration, heavy drinking, physical altercations, and ultimate agreement to an out-of-home safety plan in early 2023.

Maxine testified about OCS's efforts to help her. She informed the court that she was "sure" OCS had provided her with copies of her case plan. She testified that she knew that her case plan required her to go to a mental health provider for an assessment and testified that OCS had offered her rides, but stated that she "ha[d]n't made the attempt" to get assessed "because [she] was still drinking." She also testified that she had been contacted to set up her participation in a parenting class, but she had not participated. She testified that OCS "offered rides and every resource they could possibly help with" to get her to her drug testing.

Maxine testified about working with OCS to set up visitation. She testified that towards the beginning of her case, she was still drinking and did not want Duffy to see her in that state. She described setting up visitation with Duffy outside of OCS's supervision "as often as [Duffy's] grandfather would allow because of [her] drinking," but she was drinking "four or five days" per week. Maxine testified that she got a job in 2024 but was not doing anything to find housing and was living "here, there, [on] couches, boats, cars." She testified that it was difficult to make progress on her case plan while she was homeless, especially when she could not charge her phone.

Maxine also testified to recent steps she had taken to address her problems. Maxine testified that she was currently living at a domestic violence shelter that required sobriety, having moved there after a roommate allegedly tried to kill her. She testified that she was working part-time and hoping to move into a full-time position eventually. She also informed the court that she planned to find a more permanent housing situation and planned to enter outpatient treatment "within the end of . . . next week," although she had not yet started any treatment. And she testified to recently beginning weekly visitation with Duffy at the OCS office. Maxine estimated that she had been sober for three or four months.

The superior court issued an order terminating Maxine's parental rights. The court found Duffy to be a child in need of aid due to abandonment,[3] substantial risk of physical harm,[4] and Maxine's substance abuse.[5] Relevant to this appeal, the court credited caseworker testimony that Maxine engaged in violent behavior in Duffy's presence. It found that Maxine had an extensive history of alcohol abuse and that she had not completed an integrated behavioral assessment or a single UA test over the life of the case.

The court also found that OCS had made reasonable efforts to reunify the family. The court found that OCS had made initial efforts to prevent removal, such as the out-of-home safety plan; had created and regularly updated a case plan for Maxine; had set up monthly meetings and created a to-do list for Maxine at one of the few meetings she attended; and had regularly contacted Maxine via letter and text message.

The superior court found that OCS had proven, by clear and convincing evidence, that Maxine had failed to remedy the conduct and conditions placing Duffy at a substantial risk of harm. The court noted that Maxine had engaged in minimal contact with OCS over the preceding 24 months, had not completed any substance abuse treatment, and had not completed any other services recommended by her case

---

[3] AS 47.10.011(1) ("[A] parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter . . . .").

[4] AS 47.10.011(6) ("[T]he child has suffered substantial physical harm, or there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parent, guardian, or custodian or by the failure of the parent, guardian, or custodian to supervise the child adequately . . . .").

[5] AS 47.10.011(10) ("[T]he parent, guardian, or custodian's ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child . . . .").

plan. The court did not expressly mention Maxine's testimony that she was now living in a sober shelter.

Finally, the court found that terminating Maxine's parental rights was in Duffy's best interests, crediting testimony that Duffy would have a reliable caretaker in his grandparents.

## III. DISCUSSION

Maxine challenges two prongs of the superior court's decision. First, she argues that the evidence at trial was insufficient to establish by clear and convincing evidence that she failed to remedy the conduct that led Duffy to be found a child in need of aid. Second, she argues that the superior court erred in finding that OCS made reasonable efforts towards reunification.

### A. The Superior Court Did Not Clearly Err In Finding That Maxine Failed To Remedy Her Conduct.

The superior court may not terminate parental rights unless there is clear and convincing evidence that the parent has failed to remedy the conduct or conditions that placed the child at substantial risk of harm.[6] In this case, the superior court found that Duffy was a child in need of aid on three grounds — abandonment, risk of physical harm, and parental substance abuse — and that Maxine had failed to remedy all three of these conditions. We have held that "[a] finding of CINA status under just one statutory subsection is enough to support termination."[7] By the same logic, a finding that a parent has failed to remedy even one of the conditions that caused the child to be in need of aid is likewise enough to support termination. Because we see no clear error in the court's finding that Maxine failed to remedy her alcohol abuse, we need not address the findings that she failed to remedy the other conditions as well.

---

[6] AS 47.10.088(a)(2).

[7] *Duke S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1127, 1132 (Alaska 2018).

Whether the parent failed to remedy the conduct or the conditions that placed the child at substantial risk of harm is a factual finding, which we review for clear error.[8] Clear error exists if "review of the entire record leaves us with a definite and firm conviction that a mistake has been made."[9] "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[10]

Maxine argues that the record does not support the court's finding that she failed to remedy her issues with alcohol. This argument overlooks key evidence in the record.

In finding that Maxine failed to remedy her conduct, the superior court found that she had a history of alcohol abuse since at least 2019, had not attempted treatment since the case was opened, and had not gotten any testing. Maxine does not dispute these findings, but argues that OCS did not present enough evidence to prove that she failed to address her problem. She argues that her failure to complete the tasks in her case plan was not critical; what mattered was that she had actually changed her behavior. As proof of her changed behavior, she highlights her testimony that a few months before trial she moved into a domestic violence shelter that required residents to remain sober.

Although this step is laudable, it does not convince us that the superior court clearly erred in finding that Maxine had failed to remedy her alcohol abuse. First,

---

**8** *Sherry R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 332 P.3d 1268, 1273 (Alaska 2014) (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 428 (Alaska 2012)).

**9** *Sherman B.*, 290 P.3d at 427-28 (quoting *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1253 (Alaska 2010)) (internal quotation marks omitted).

**10** *Id.* at 428 (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

she does not contest the superior court's factual finding that by the time of the termination trial she had not participated in outpatient treatment, behavioral therapy, or any other programming to make sure she would remain sober after leaving the shelter. Second, although she argues that the only reason her sobriety was not "demonstrated" was because OCS did not verify that she was sober, OCS attempted to verify her sobriety through random testing, which she never did.[11] Third, Maxine does not dispute that she had previously relapsed after periods of sobriety. Finally, her sobriety was a recent development.

Therefore, her case is similar to others in which we have affirmed findings that parents failed to remedy substance abuse despite some progress on the eve of the termination trial.[12] For example, in *Barbara P. v. State, Department of Health & Social Services, Office of Children's Services*, we ruled that the superior court did not clearly err in finding that a mother failed to remedy her drug use despite having been sober for six months at the time of trial.[13] The court found that although she had completed treatment, she had failed to attend follow-up meetings or maintain contact with her

---

[11] Maxine also argues that OCS only screened Maxine for drugs and not alcohol. This is not so; the caseworker testified that the UAs that OCS set up tested for alcohol. The superior court's reference to drug tests appears to have been a shorthand for drug and alcohol testing.

[12] *See, e.g.*, *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 74 P.3d 896, 902-03 (Alaska 2003) (affirming finding that parent had not remedied conduct that put her children at risk despite year-long period of sobriety because sobriety was still "a relatively new phenomenon in her life"); *Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1112-13 (Alaska 2010) (affirming finding that nine-month period of sobriety was insufficient); *Barbara P.*, 234 P.3d at 1261 (affirming finding that six-month period of sobriety was insufficient); *Christopher C. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 303 P.3d 465, 475-76 (Alaska 2013) (affirming finding that eight-month period of sobriety, four months of which occurred in residential treatment, was insufficient).

[13] 234 P.3d at 1261.

sobriety sponsor, and she denied her previous drug use.[14] We reasoned that the court "properly relied on the mother's history of relapses and the questionable degree to which she accepted that she had a substance abuse problem."[15] In this case, although Maxine did not deny her alcohol problem, the problem was longstanding, she had previously relapsed after treatment, she had not attempted treatment in the previous two years, and her relatively short period of sobriety was achieved within the structured setting of a domestic violence shelter. Therefore, we are not firmly convinced that the superior court was wrong to find that she had not remedied her alcoholism.

**B.      The Superior Court Did Not Err In Finding That OCS Made Reasonable Efforts To Reunite Maxine And Duffy.**

The superior court may not terminate parental rights unless it finds, by clear and convincing evidence, that OCS has made "timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed to . . . enable the safe return of the child to the family home."[16] OCS must identify relevant support services, actively offer and refer the parent to these services, and document its efforts.[17] These efforts need not be perfect to be reasonable, and "[i]n evaluating whether OCS has made reasonable efforts, the court should 'look at . . . the parent's level of cooperation with OCS's efforts.' "[18] Whether OCS made reasonable

---

[14]      *Id.*

[15]      *Id.* (citing *Sherry R.*, 74 P.3d at 902-03).

[16]      AS 47.10.086(a) (imposing duty to make reasonable efforts); AS 47.10.088(a) (requiring finding by clear and convincing evidence).

[17]      *See, e.g., Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 267 (Alaska 2019).

[18]      *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 310 P.3d 943, 953-54 (Alaska 2013) (quoting *Tara U. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 239 P.3d 701, 705 (Alaska 2010)).

reunification efforts is a mixed question of fact and law.[19] We review factual findings for clear error; whether OCS's efforts satisfy the duty of reasonable efforts is a legal question we review using our independent judgement.[20]

The superior court determined that OCS had made reasonable efforts and highlighted OCS's initial efforts to prevent removal with an out-of-home safety plan. The court noted that OCS created and updated case plans for Maxine, regularly contacted her through letters and text messages and encouraged her to meet in person, and made her a to-do list at one of the few meetings she attended. Maxine asserts deficiencies in three areas: (1) communications, (2) visitation, and (3) services.

### 1. Communications

Maxine argues that OCS failed to notify her of important information. This argument misses the mark.

Maxine focuses on OCS's decision to send letters to an address at which she did not reside, but this focus overlooks the superior court's finding that OCS maintained regular contact with Maxine "via letter and text message." There is ample evidence in the record that OCS consistently texted Maxine, and received responses from her, in attempting to engage her in services. Maxine's homelessness made it difficult for her to consistently receive mail, so text was the most reasonable way to communicate with her. Given the extensive documentation of text messages in the record, any shortcomings in OCS's use of paper mail do not make its efforts at communicating with Maxine unreasonable.

Her assertion that OCS acted unreasonably by sending mail to "what [it] knew was an incorrect address" is also unpersuasive. The primary caseworker testified that Maxine had said that she would receive mail at this address, which was where her

---

[19] *Jimmy E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 529 P.3d 504, 513 (Alaska 2023) (citing *Sherman B.*, 310 P.3d at 949).

[20] *Id.* (citing *Sherman B.*, 310 P.3d at 949).

mother lived. It was reasonable for OCS to send her letters to the only permanent address OCS had on file. This is especially true since Maxine herself told OCS that she would receive mail if it was sent there.

### 2. Visitation

Maxine argues that OCS "seemingly provided zero services" with respect to visitation. She argues that OCS "forced [her] and the foster parents to work it out for themselves," despite Maxine and Duffy residing in the same community (implying that visitation could have been easily set up by OCS).

"A parent's willingness to participate in services is relevant to the scope of the efforts OCS must provide,"[21] and "a superior court may consider parents' level of cooperation with OCS in evaluating whether OCS made reasonable efforts."[22] In this case the primary caseworker testified that despite making several attempts to set up visitation, he was unable to do so unless Maxine met with him to discuss visitation guidelines.[23] But Maxine would not commit to meeting with him to go over the visitation guidelines, so visitation was not set up.

On this issue, it seems possible OCS could have done more. Maxine did meet with the caseworker on a few occasions, and it is unclear why the visitation guidelines were not discussed then.

Yet these shortcomings are not fatal. Maxine herself testified that OCS had tried to set up visitation earlier in the case, but she had not wanted Duffy to see her while she was still drinking. And she testified that when she attempted to arrange visitation directly with Duffy's grandfather, he often would not allow it because she

---

[21] *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 432 (Alaska 2012) (quoting *Sean B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 251 P.3d 330, 338 (Alaska 2011)).

[22] *Jimmy E.*, 529 P.3d at 522 (citing *Sherman B.*, 310 P.3d at 953-54).

[23] Earlier in his testimony, the caseworker testified that he did not recall "at the moment" why visits were not scheduled after their October 2023 meeting.

was drinking "four or five" days a week. Therefore, the main limitation on Maxine's visitation with Duffy was not OCS's failure to arrange it, but Maxine's intoxication. OCS "has discretion in determining what efforts to pursue based on the case plan and the parent's needs."[24] It seems reasonable for OCS to have focused its limited time with Maxine on connecting her to services, especially since OCS was aware that visitation, although limited by Maxine's drinking, was occurring informally.

### 3. Rehabilitative services

Maxine argues that the superior court erred in finding that OCS made reasonable efforts to provide her with rehabilitative services. But her arguments are not persuasive, whether considered individually or together.

Maxine faults OCS for failing to get her input when drafting case plans. But OCS was unable to obtain her input because Maxine did not attend case planning meetings — despite the caseworker's efforts to involve her. The caseworker sent Maxine numerous texts attempting to set up meetings about her case plan. Maxine also suggests that OCS may not have informed her of the services OCS offered her, but at trial she testified that she was "sure" that OCS had provided her copies of her case plans. And she recalled at trial that she knew she "was supposed to go to alcohol treatment, even AA meetings, [and] go see" the mental health provider but had not done so. There is no basis to conclude that OCS failed to inform her of the steps she needed to take.

Maxine's argument that OCS did not help her obtain a behavioral health assessment "in any way" contradicts her caseworker's testimony and her own. The caseworker testified that the clinic that performed these behavioral assessments operated on a first-come, first-served basis with a walk-in only policy. Thus, an effective way OCS could help Maxine receive an assessment was to help her arrive

---

[24] *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 534 (Alaska 2013).

early to the clinic.[25] To that end, the primary caseworker testified that he offered her rides and bus passes. Maxine herself testified that OCS had offered to get her an assessment, that she had made virtually no attempts to get one, that OCS offered her rides to make sure she got there on time, and that she had turned down OCS's ride offers "[b]ecause [she] was still drinking."[26]

Maxine faults OCS for failing to follow up on the recommended parenting class after the initial referral, but she testified that the service provider reached out directly to her and that "[she] just didn't go and [she] couldn't make it" because she "didn't want to take time off work." And there is no indication in the record that Maxine informed OCS of the scheduling conflict so that it could look for other options.

Finally, Maxine argues that OCS made no efforts to help her find suitable housing. But OCS was not required to obtain housing for Maxine before addressing her problems with substance abuse. Instead, it could reasonably have determined that her homelessness stemmed from her drinking and focused its efforts on the latter. When OCS first investigated in the fall of 2022, Maxine was living with her mother, but her excessive drinking led to violent behavior and her departure from the home. And she testified that she was doing "[n]othing" in 2024 to find stable housing and that drinking was a "large part" of what made it difficult to work her case plan. Therefore, it was reasonable for OCS to focus, during the limited time Maxine was willing to engage, on getting her an assessment that could provide appropriate recommendations for treating her alcoholism.

---

[25] Even though the mental health provider was first-come, first-served, Maxine's first caseworker called the provider and tried to set up an appointment for Maxine early in her case plan.

[26] Maxine suggests that OCS was delinquent because it did not have her execute a release of information, but because she failed to make contact with referred service providers, there was no information to be released.

Overall, we see no error in the superior court's determination that there was clear and convincing evidence that OCS made reasonable efforts to provide rehabilitative services to reunite the family and that these efforts were not successful.

## IV. CONCLUSION

The order terminating parental rights is AFFIRMED.