NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

LOUIS W., )
)
     Appellant, )
)
 v. )
)
STATE OF ALASKA, )
DEPARTMENT OF HEALTH & )
SOCIAL SERVICES, OFFICE OF )
CHILDREN'S SERVICES, )
)
     Appellee. )
_____ )

Supreme Court No. S-16000

Superior Court No. 4FA-13-00106 CN

<u>MEMORANDUM OPINION
AND JUDGMENT</u>*

No. 1575 – March 16, 2016

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Douglas Blankenship, Judge.

Appearances: Shelley K. Chaffin, Law Office of Shelley K. Chaffin, Anchorage, for Appellant. Joanne M. Grace, Assistant Attorney General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Fabe, Maassen, and Bolger, Justices. [Winfree, Justice, not participating.]

_____

  *   Entered under Alaska Appellate Rule 214.

# I.  INTRODUCTION

The superior court terminated a father's parental rights, concluding that he had abandoned his son because he largely refused to participate in his case plan and because he did not manifest an intent to parent the child.  On appeal, the father argues that his due process rights were violated, that the superior court's factual findings were erroneous, and that his regular and positive visitation with his son shows that he intended to act as a parent and thus forecloses a finding of abandonment.  We affirm the superior court's order:  the father's due process rights were not violated, the superior court's factual findings are fully supported by the record, and those findings support the termination of the father's parental rights to his son.

# II.  FACTS AND PROCEEDINGS

Louis W. and his wife came to Alaska in 2010 to care for their grandchild while their daughter was in the military.[1]  Louis found work at a fast food restaurant, where he met Tonya B.  She was also married and had three children at the time.

Louis and his wife left Alaska after eight months.  They returned at the end of 2012.  Around the time of their return, Tonya informed Louis that he was the father of her son Ely, born on January 4, 2011.

Louis testified that he had "multiple contacts" with Ely after learning he was Ely's father.  He stated that he would meet up with Tonya and spend "a couple hours" with Ely at a time and that he had "a few overnights" at Tonya's home during which he spent time with Ely.

On September 23, 2013, Tonya moved herself and her children to a local women's shelter to escape her husband's domestic violence.  On October 5, OCS received a report that Tonya abandoned the children at the shelter.  Shelter staff reported

---

[1]     Pseudonyms are used to protect the family's privacy.

that another resident witnessed Tonya smoking crack cocaine in front of the children on the morning of October 4; Tonya then asked a friend to watch the children for the day, left the shelter, and did not return.

OCS filed an emergency petition for temporary custody of the children on October 6. The court granted the emergency petition on October 11, finding probable cause existed to believe that Tonya's substance abuse created a substantial risk of harm to the children.

OCS family services worker Rosalie Rein was assigned to the case on October 23 or 24, 2013. Rein made repeated attempts to contact Louis, but he did not immediately respond. On December 11, 2013, she mailed Louis an initial case plan.

Louis learned that Ely was in OCS's custody in October 2013. He first contacted Rein on December 18 and left a message because she was on leave; Rein returned his call on December 31. She testified that Louis told her that "things had been going on in his life" but he was ready to meet at that time.

The two met to discuss case plan activities on January 2, 2014. Rein swabbed Louis for DNA for paternity testing.[2] Louis stated that he believed only Tonya needed to follow a case plan because the children were removed from her care, not his. Rein testified that she explained that OCS was also concerned about Louis's behavior because "he hadn't ensured that his child would be in safe hands" despite recognizing that Tonya had substance abuse issues.[3]

Rein was also concerned about other aspects of Louis's conduct. She testified that Tonya's two daughters reported that Louis made "inappropriate comments

---

[2]     The court issued an order establishing Louis's paternity on March 19, and Louis was subsequently appointed counsel.

[3]     At trial, Louis denied knowing about the extent of Tonya's substance abuse, while Rein testified that he had told her he was aware of Tonya's issues.

about their bod[ies]" and that he would ask the oldest daughter to sit on his lap. She also testified that the children disclosed that they had witnessed Louis beat Tonya and that he had also brought his wife to the home and beat her there. OCS had heard from the Fairbanks Police Department that Louis "was well known for his history of cocaine use and violence." Rein was further concerned about domestic violence because she incorrectly believed Tonya was staying in the women's shelter because of Louis.

On January 23 or 24, OCS transferred the case to Cindy Evans and then shortly thereafter to Dana Sweatt, an OCS intern. Sweatt implemented a new case plan for Louis in late January or early February. This case plan provided:

a. for paternity testing to establish or disestablish [Louis] as the father of [Ely];

b. [Louis] would provide UA's [urinalysis] on a random basis at the request of OCS;

c. [Louis] would develop a relationship with his son;

d. [Louis] would assist the agency "in determining the best course of action";

e. [Louis] would provide a drug and violence free home for his child; and

f. [Louis] would meet with his case worker on a regular basis.

At some point during Sweatt's tenure, Louis and Sweatt discussed placing Ely with Louis's parents, Charles and Barbara H., in Virginia. Louis testified that they decided that Ely would go to Virginia and that Sweatt stopped pushing his case plan afterward.

Louis attended most scheduled meetings with his case workers. After his initial meetings with Rein, however, he refused to discuss his case plan. Rein and Patrick Enters, a case worker who took over from Sweatt, attempted to engage him with the plan.

But Louis believed that because OCS had not removed Ely from his care, "OCS had no rights to have any concerns about him or get information from him." Louis also stated that he did not engage with the case plan because he believed OCS planned to place Ely with Charles and Barbara in Virginia.

Louis initially participated in the UA program, but he dropped out of the program after February 21, 2014. The program required him to call in each weekday; when he called, the program would inform him of whether he was scheduled to take a random UA that day. During January and February 2014, he called in only six times and took only two UAs out of a scheduled five. After February 21, 2014, he stopped calling altogether until February 9, 2015, when he took a third and final UA. All of his UAs were positive for marijuana, and the second UA was also positive for alcohol. None were positive for any other substances.

OCS also referred Louis to the ALEX program, which Louis testified was a job placement assistance program. Louis testified that he checked into the program, but did not complete it because he did not feel he needed job placement assistance when he already had a job. OCS did not present testimony about the ALEX program, and the court specifically found that Louis participated adequately in it.

Louis regularly attended visitation with Ely at OCS. According to Enters, Louis did "an amazing job" at his visits and actively engaged with Ely. These visits were one hour long, once per week.

OCS assigned Enters as the case worker on or about April 18, 2014, and Enters was the case worker at the time of the termination trial. Enters testified that he wanted to continue with the case plan Sweatt had initiated, at least at first, to give Louis some continuity. But when they first met, Louis "adamantly" stated that he did not believe he should have a case plan at all because Ely was not removed from his care. Louis's refusal to participate concerned Enters; Enters testified that "it showed [him] that

[Louis] wasn't moving on to the next step of parenting," and that it meant OCS was unable to address its concerns with Louis's alleged "substance abuse, domestic violence, [and] inappropriate relationships with children." Enters testified that Louis stated at that meeting that he wanted to continue visitations with Ely, which OCS continued to provide.

Enters and Louis met again on June 12 to discuss case planning. Louis reiterated that he would like OCS to place Ely with Charles and Barbara in Virginia and that if Ely were placed with Charles and Barbara he should not have to participate in a case plan. Louis provided Enters with his parents' names and contact information, and on June 16 OCS sent a placement request to Virginia under the Interstate Compact on the Placement of Children (ICPC).[4]

Louis and his parents attended a June 23 case review meeting. At the meeting, Louis again stated that he wanted OCS to place Ely with Charles and Barbara and that he saw no reason to engage in his case plan. Enters told Louis that without participating in his case plan, he could not regain custody of Ely and that it was possible his parental rights would be terminated. Enters testified that he also explained to Louis that even if Ely were placed with Charles and Barbara, Louis would still need to engage with OCS to achieve reunification with Ely.

OCS filed a Permanency Report for Ely on September 22. In the report, it recommended a permanency plan of "[a]doption with a concurrent goal of reunification." It noted Tonya's ongoing substance abuse and mental health issues and concerns with

---

[4]     AS 47.70.010–.080. The ICPC is an interstate agreement establishing procedures for the placement and adoption of children across state lines. AS 47.70.010.

Louis's "substance use, domestic violence, basic needs, and appropriate physical boundaries and other dynamics with children based on their sex, age, and relationship." It also discussed Louis's lack of cooperation with his case plan.

The court held a permanency hearing on October 3 and approved the change of goal to adoption concurrent with reunification. Louis initially objected to the goal change, stating that OCS had not made sufficient efforts to place Ely with Charles and Barbara. Louis withdrew this objection on October 8 after learning that OCS was taking steps to obtain a home study for Charles and Barbara and making progress on placing Ely with them.

On October 23, 2014, OCS filed a petition for termination of Tonya's and Louis's parental rights to Ely. OCS alleged that Ely was a child in need of aid under AS 47.10.011(1) (abandonment), (9) (neglect), and (10) (substance abuse). With respect to Louis, the petition asserted that he was "unwilling and unable to identify how [Tonya's] unaddressed mental health and substance abuse issues affect their ability to be safe and appropriate parents" and noted his "lack of engagement in services and inability to identify how his substance abuse, unstable living environment, and lack of parenting knowledge places [Ely] at substantial risk."

In or around December 2014, OCS learned that Virginia denied the request to place Ely with his grandparents under the ICPC. Without an approved ICPC request, OCS could not place Ely in Virginia.[5]

Nicole Havrilek, an OCS supervisor, testified that she met with Louis on December 8, 2014, to discuss the ICPC denial. She testified that Louis still refused to engage with his case plan. She stated that Louis told her that "he wasn't worried about it . . . because [Tonya's] going to get in a program and get the kids back," that "he hadn't

---

[5]    *See* AS 47.70.010 (art. III).

done anything wrong, and that he was working and had his own business and didn't have time to do other things." She testified that she informed Louis "that time was running out," but that he was unconcerned.

In February 2015, Louis met again with Enters. At the termination trial, Enters described Louis's "change of heart": "[H]e pretty much sat down and asked me what are my chances of getting my son back? Is there any hope?" Enters testified that he told Louis that his refusal to engage so far "doesn't look good" and that he should talk with his attorney about his options, but Enters did work with Louis at that meeting to create a new case plan. This case plan for the first time required Louis to take a substance abuse assessment and a parental risk assessment. Enters testified that Louis took one UA on February 9 and that he had not taken either assessment by the time of the trial.

The termination trial was held in Fairbanks from March 2 to 4, before Superior Court Judge Douglas Blankenship. The court terminated Louis's parental rights, finding that Louis's refusal to engage with his case plan and his plan for Ely to be raised by Charles and Barbara in Virginia meant that he had abandoned Ely. The court found by clear and convincing evidence that Louis had abandoned Ely, that Louis had failed to remedy his conduct within a reasonable time, and that OCS had provided reasonable efforts designed to reunify Louis with Ely. And the court found by a preponderance of the evidence that termination was in Ely's best interest. Louis appeals.

## III.  STANDARD OF REVIEW

We review a superior court's factual findings in child in need of aid cases for clear error.[6] "We will conclude that a factual finding is clearly erroneous . . . if

---

[6]  *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 427 (Alaska 2012) (citing *Christina J. v. State, Dep't of Health &*
(continued...)

review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[7] "Whether a trial court's findings satisfy the relevant statutory requirements is a question of law that we review de novo."[8]

## IV.    DISCUSSION

Four elements must be present before a court may terminate parental rights to a non-Indian child.[9] The court must find by clear and convincing evidence that:

> (1) the child has been subjected to conduct or conditions described in AS 47.10.011;
>
> (2) the parent . . . has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or . . . has failed, within a reasonable time, to remedy the conduct or conditions in the home . . . so that returning the child to the parent would place the child at substantial risk of physical or mental injury; and
>
> (3) [OCS] has complied with the provisions of AS 47.10.086 concerning reasonable efforts.[10]

---

[6]      (...continued)
*Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1103 (Alaska 2011)).

[7]      *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 251 P.3d 330, 335 (Alaska 2011) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

[8]      *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 672-73 (Alaska 2008) (citing *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

[9]      *See* AS 47.10.088.

[10]      AS 47.10.088(a) (emphasis added). Alaska Statute 47.10.086(a) requires OCS to "make timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed . . . to enable the safe return of the child to the family home."

The court must also find by a preponderance of the evidence that termination of parental rights is in the best interests of the child.[11]

### A. Neither The Superior Court Nor OCS Violated Louis's Due Process Rights.

Louis's primary argument is that termination of his parental rights violated his and Ely's due process rights. First, he claims that the superior court reversed the burden of proof by requiring him to disprove the conduct alleged by OCS, instead of requiring OCS to prove that conduct by clear and convincing evidence. Second, he claims that his case plan required him to disprove "rumors, unreliable hearsay . . . , and misinformation" and that, as a result, terminating his parental rights based on a failure to participate in his case plan violated his due process rights. In particular, he points to OCS's concerns about his substance abuse, domestic violence, and inappropriate interactions with Tonya's other children, and he argues that his refusal to take UAs, the reports from the children, and OCS's communications with the Fairbanks Police Department were insufficient bases upon which to form these concerns.

The superior court did not require Louis to disprove any particular conduct, and none of the alleged conduct that he disputes was the basis for the termination of his parental rights. Indeed, the court specifically found that OCS had failed to meet its burden to show that Louis's ability to parent was substantially impaired by substance abuse or that Louis neglected Ely. Instead the basis for the termination of Louis's parental rights was his abandonment of Ely. The finding of abandonment was based on Louis's failure to engage with his case plan and his plan for Ely's placement with

---

[11]    AS 47.10.088(c); CINA Rule 18(c)(3).

Charles and Barbara. Louis did not dispute either of these facts, and the superior court specifically found that OCS had shown abandonment by clear and convincing evidence. Louis is therefore incorrect that the superior court reversed the burden of proof.

Louis also appears to argue that because his case plan required him to disprove conduct that OCS could not prove by clear and convincing evidence at a trial, his refusal to comply with the plan was justified. But the case plan did not require him to *disprove* anything. Instead it required him to show that he could *presently* provide a safe home for Ely. None of the elements of his case plan relate to his past behavior, with the possible exception of the paternity test. For example, the case plan required him to show that he could presently "provide a drug and violen[ce] free home for his son," not to show that he had not used drugs or been violent in the past.

OCS has a responsibility to ensure the safety of children in its custody.[12] Any parent with a child in OCS custody must therefore demonstrate that he or she can provide a safe home for the child before regaining custody. As the superior court noted, "if OCS is confronted with reasonably trustworthy information, it must investigate the allegation to either confirm or eliminate the concern." Generally, the best way to investigate such concerns is to go directly to the source: the parent. But under Louis's argument, OCS may not investigate its concerns via a parent's case plan unless it *already believes* that termination of the parent's rights would be proper. There is no reason that OCS may not involve the parent in its investigations of safety concerns, and addressing such concerns in a case plan does not violate the parent's due process rights because

---

[12] AS 47.10.084(a) ("When a child is committed . . . to [OCS] . . . a relationship of legal custody exists. This relationship imposes on [OCS] . . . the responsibility of physical care and control of the child, the determination of where and with whom the child shall live, [and] the right and duty to protect, nurture, train, and discipline the child . . . .").

parental rights still may not be terminated absent clear and convincing evidence that "conduct or conditions [exist] in the home that place the child at substantial risk of harm" and that the parent has failed to remedy the conduct or conditions.[13]

We therefore conclude that OCS did not violate Louis's due process rights by asking him to show that he could provide a safe home for Ely, or by crafting a case plan to address concerns about Louis's substance abuse, violence, and interactions with children. And because the superior court found that OCS demonstrated by clear and convincing evidence that Louis had not participated in that case plan, we conclude that the court did not reverse the burden of proof and did not violate Louis's due process rights.

**B. The Superior Court Did Not Err In Finding That Louis Abandoned Ely.**

A court may only terminate parental rights when one of the "conduct or conditions described in AS 47.10.011" exists;[14] such circumstances include abandonment.[15] Under AS 47.10.013(a) "the court may find abandonment of a child if a parent or guardian has shown a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision." The statute lists examples of abandonment, including "instances when the parent or guardian, without justifiable cause, . . . failed to participate in a suitable plan or program designed to reunite the parent or guardian with the child."[16] We have interpreted AS 47.10.013(a) as a two-part test: "(1) [t]here must be parental

---

[13]  *See* AS 47.10.088(a)(2).

[14]  AS 47.10.088(a)(1).

[15]  AS 47.10.011(1).

[16]  AS 47.10.013(a)(4).

conduct evidencing a 'willful disregard' for parental obligations, leading to (2) the destruction of the parent-child relationship."[17]

### 1.    Willful disregard of parental obligations

The superior court found that Louis's failure to engage with his case plan showed that "he consciously disregarded his parental obligations."  Louis contends that he engaged sufficiently with his case plan.[18]

Louis does not contest that he did not participate in several aspects of his case plan.[19]  Instead he argues that the superior court's findings do not meet the statutory definition of abandonment.  He points out that while AS 47.10.013(a)(4) provides that a parent who fails to participate in a suitable case plan has abandoned the child, he has merely failed to *complete* his case plan, not failed to participate altogether.

Alaska Statute 47.10.013(a)(4) "require[s] more than minimal participation" in a case plan.[20]  Much like Louis, the father in *Sherman B. v. State,* visited his child

---

[17]     *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 251 P.3d 330, 335 (Alaska 2011) (quoting *Rick P. v. State, Office of Children's Servs.*, 109 P.3d 950, 957 (Alaska 2005)).

[18]     Because we conclude that Louis's failure to work his case plan constituted abandonment, we do not address the superior court's separate conclusion that Louis's plan for his parents to care for Ely "constitute[d] abandonment as a matter of law."

[19]     He offers some justifications for this failure, which we address below in Section IV.D.

[20]     *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 950 (Alaska 2013) (quoting *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 951 (Alaska 2000)).  Louis cites to the dissent in an unpublished case to support his claim that his partial participation in his case plan means that he did not abandon Ely.  *Lance H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 2012 WL 3870821, at *11-*12 (Alaska 2012) (Winfree, J., dissenting).  But in that case, we specifically noted that "more than minimal participation" is required.  *Id.*
(continued...)

regularly until shortly before the termination trial but refused to participate in other aspects of his case plan.[21]  Despite his partial compliance with his case plan, we found "no clear error in the superior court's finding that Sherman failed, without justification, to participate in his case plan."[22]

Louis only participated minimally in his case plan.  He took a paternity test, and he regularly visited Ely.  But he provided only three UA samples out of at least 41 required, despite knowing that OCS would interpret missed UAs as positive for substances.  He made no effort to establish a relationship with Ely beyond the hour-long weekly visits, although Havrilek testified that "[m]eaningful and consistent participation in the case plan" would have resulted in increased visitation.  He consistently refused to discuss case planning with his case workers.  And by the time of the permanency hearing, if not earlier, Louis was aware that failure to participate in his case plan could lead to termination of his parental rights.  Louis had the opportunity to assume a parental role and demonstrate to OCS that Ely would be safe in his custody; he chose not to do so.[23]

---

[20]    (...continued) at *7 (quoting *A.B.*, 7 P.3d at 951).  And Justice Winfree's dissent was concerned with parents who engage with a case plan but are unable to complete it, not parents who, like Louis, simply refuse to engage.  *Id.* at *11.

[21]    *Sherman B.*, 310 P.3d at 948.

[22]    *Id.* at 951.

[23]    *See Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 430 (Alaska 2012) ("Although the facts before us do not present the typical case of abandonment, where a parent is absent for a long period of time, the facts as a whole support a finding that Sherman has consciously disregarded his parental responsibilities.").

We therefore affirm the superior court's finding that Louis willfully disregarded his parental obligations.

## 2.     Destruction of the parent-child relationship

The superior court doubted that a "parent-child relationship" ever existed between Louis and Ely and found that, even if one had, Louis's conduct destroyed that relationship.  The record supports these findings.

With respect to pre-custody contact, Louis testified that he had "multiple contacts" with Ely after learning that he was Ely's father at the end of 2012.  He would meet up with Tonya and "spend a little time with [Ely], a couple hours," although he did not estimate how many times this happened.  And he testified that he "had a few overnights [at Tonya's residence] with [Ely]."  The court also noted that Louis had no contact with Ely after OCS took custody until January 2014.  The irregularity and short duration of these contacts support the court's conclusion that "[Louis] and [Ely] did not have a father-son relationship."

After OCS took custody, one-hour visitations "assisted in continuing the acquaintance of three year old [Ely] with [Louis] but not much more."  Rein testified that one-hour visits are "not enough" but that OCS lacked the resources to facilitate longer visits, and Havrilek testified that one-hour visits are not "sufficient to maintain the bond between a parent and child and promote the child's healthy bond with that parent."  OCS was not solely to blame for the short visits:  Rein also testified that visit frequency and length were based on "the nature of the relationship between the child and the parent and the frequency that they were seeing one another before . . . these visits had started."  And Havrilek testified that Louis could have progressed to trial home visits with Ely if he had engaged with his case plan and demonstrated that Ely would not have been at risk in the home.

Louis points to the reference on his case plans to his "strong bond" with Ely and emphasizes his regular and positive visitations. The superior court noted this evidence, but the record also supports the court's conclusion that Louis's willful disregard of his parental obligations destroyed any parent-child relationship that existed between him and Ely.[24] We affirm this conclusion.

## C. The Superior Court Did Not Err In Finding That Louis Had Failed To Remedy His Conduct.

The record also supports the superior court's conclusion that Louis "failed, within a reasonable time, to remedy the conduct or conditions that placed [Ely] at substantial risk of harm."[25] The "conduct and conditions" were abandonment — not, as Louis argues, his alleged substance abuse and domestic violence. And although Louis started to show signs of improvement in February 2015, less than a month before the termination trial, the record supports the court's conclusion that Louis had not remedied his lack of participation in his lack of intent to parent Ely.

Louis consistently refused to engage with his case plan until just before the termination trial when he met with Enters and received a new case plan. By the time of

---

[24] *See Pam R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 185 P.3d 67, 71 (Alaska 2008) ("[W]e will not reweigh evidence when the record provides clear support for the trial court's ruling." (citing *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 214 (Alaska 2000))).

[25] In making this determination, the court may consider:
(1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
(2) the amount of effort by the parent to remedy the conduct . . .;
(3) the harm caused to the child;
(4) the likelihood that the harmful conduct will continue; and
(5) the history of conduct by . . . the parent.
AS 47.10.088(b).

trial, his only engagement with this new plan was to take one UA. He expressed willingness to take a substance abuse assessment and a parenting assessment, but Enters testified that he was still waiting for Louis to select a provider for those assessments. At the termination trial, Louis maintained his position that he had no need "to work on [him]self" because he was already "a good dad."

Although it is possible that Louis would have followed through on his newfound motivation to engage with his case plan, he had not done much to demonstrate his sincerity by the time of the termination trial. The court reasonably had doubts as to whether "[Louis] truly desires to parent [Ely]." And as the superior court noted, even if Louis began to participate in his case plan, "there is no foreseeable date when the [parent-child] relationship would likely be established." We therefore affirm the superior court's finding that Louis failed to remedy his abandonment of Ely.

**D.     The Superior Court Did Not Err By Finding That OCS Made Reasonable Efforts To Reunify Louis And Ely.**

Louis argues that OCS did not engage in reasonable efforts to reunify him with Ely as required by AS 47.10.086. In finding that OCS's efforts "were clearly and convincingly reasonable," the superior court noted Louis's refusal to engage with his case plan and his case workers' repeated efforts to get him to engage. The court also noted the services that OCS did provide, including the ALEX program, weekly visitation, assistance with the interstate placement process, and the UA program. And the superior court specifically found that OCS's efforts were reasonably designed to remedy his behavior, by attempting to get him engaged and by starting simple with the case plan and gradually increasing once he became engaged.

Louis first argues that OCS's efforts must only be directed to the conditions that caused a child to be initially in need of aid. Because "[t]he problem that caused Ely to be in-need-of-aid was Tonya's use of cocaine and abandonment of Ely at the women's

shelter," Louis claims that OCS should not have considered his "shortcomings as a parent, if any." He relies on *Burke P. v. State, Department of Health & Social Services, Office of Children's Services*, in which we stated that "OCS must provide a parent with a 'reasonable opportunity . . . to remedy the behavior that caused his [or her] children to be in need of aid.' "[26]

This argument has two main flaws. First, as the superior court found, Louis's behavior did cause Ely to be a child in need of aid. Although Tonya's conduct was the initial catalyst for removal, the superior court found by clear and convincing evidence that Louis's abandonment also caused Ely to be a child in need of aid.

Second, *Burke P.* does not hold that OCS may *only* attempt to remedy the behavior that initially caused the child to be in need of aid. Alaska Statute 47.10.086(a) requires OCS to make reasonable efforts "that are designed to . . . enable the safe return of the child to the family home, when appropriate." OCS is thus required to address all safety concerns, not only the concerns that were present at the time of removal. And it is clear that a parent's rights may be terminated based on conduct or conditions that were not the basis for adjudicating the child to be a child in need of aid;[27] it must therefore be possible for OCS to direct "reasonable efforts" toward such conduct as well.

Louis also alleges specific OCS failings. He claims that OCS should have "offer[ed] services such as low-income housing and child-care subsidy information and/or services," that OCS should have submitted the interstate placement request with Virgina earlier, and that his failure to take UAs was justified because the UA program

---

[26] 162 P.3d 1239, 1244-45 (Alaska 2007) (alteration in original) (quoting *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003)).

[27] *Jeff A.C., Jr. v. State*, 117 P.3d 697, 703 (Alaska 2005) ("[A] specific parent's acts need not have been the subject of a prior adjudication hearing.").

was unnecessary and because case worker Sweatt allegedly informed him he could discontinue taking them.

As the superior court found, OCS's plan was to engage Louis with simple tasks and activities first, then increase involvement. Given Louis's intense resistance to *any* OCS involvement, this plan was reasonable.

It is also possible that if the interstate placement request was sent earlier, it would have been denied earlier, thus giving Louis more time to make true on his "change of heart." But, based on the record, it is not clear that sending the request earlier would have been possible; Enters testified that the process takes time, "because [OCS] ha[s] to compile the documents, figure out addresses, [and] send it off to Juneau for [the] state ICPC process." And the potential impact of sending the request in March rather than June was so attenuated that the delay, even if unnecessary, was not unreasonable.

Louis also argues that it was unreasonable for OCS to continue to include UAs as part of his case plan once he had two UAs return negative for substances other than alcohol and marijuana. But he ignores that he failed to take the vast majority of his required UAs and never called in each weekday, as his case plan required. This quite reasonably raised further concerns with OCS, especially given that he knew missed tests would be considered positives. As a result, it was not unreasonable for OCS to retain this case plan element designed to address those concerns. Moreover, it was not unreasonable for OCS to address its substance abuse concerns with UAs rather than an alternative assessment when Louis refused to discuss additions or modifications to the case plan at all.

Given OCS's efforts to engage Louis in his case plan, his repeated refusal to participate in any way other than visitation, and the services OCS did provide, we affirm the superior court's conclusion that OCS made the required reasonable efforts.

**E.**     **The Superior Court Did Not Err In Finding That Termination Of Louis's Parental Rights Was In Ely's Best Interest.**

Finally, the superior court found by a preponderance of the evidence that termination of Louis's parental rights was in Ely's best interest. It based this conclusion largely on the findings it had already made — Louis "[did] not present as a biological parent who desires to establish a true parent-child relationship with his son." The court noted Ely's need for permanency and stability and concluded that Louis's behavior thus far makes it "doubtful whether he would create a permanent and stable home for [Ely]." Louis's lack of interest in parenting, combined with Ely's already lengthy stay in foster care, led the court to conclude that termination of Louis's parental rights was in Ely's best interest.

Louis again contests the factual findings grounding this conclusion, arguing that he "has a true parent-child relationship with his son." But the superior court found to the contrary, and we affirm this finding. It was not clearly erroneous for the superior court to conclude that Louis cannot provide the permanence and stability that is in Ely's best interests.

**V.     CONCLUSION**

The superior court's order terminating Louis's parental rights to Ely is AFFIRMED.