NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| TED S., | ) |
| | ) Supreme Court No. S-17719 |
| Appellant, | ) |
| | ) Superior Court Nos. 3DI-14-00005/ |
| v. | ) 00006 CN |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) MEMORANDUM OPINION |
| OF HEALTH & SOCIAL SERVICES, | ) AND JUDGMENT[*] |
| OFFICE OF CHILDREN'S SERVICES, | ) |
| | ) No. 1799 – October 28, 2020 |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Dillingham, Christina Reigh, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Laura E. Wolff, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices.

## I.    INTRODUCTION

A father appeals the termination of his parental rights.[1] He makes three

---

[*]    Entered under Alaska Appellate Rule 214.

[1]    The children's mother relinquished her parental rights in July 2018 and is not a party to this appeal.

arguments. He first asserts the superior court clearly erred when it found his children were in need of aid due to his incarceration and failure to make adequate arrangements for their care.[2] He also argues that the court clearly erred when it found that he had not remedied his conduct or the conditions[3] and that his children would suffer harm if they were returned to his custody.[4] Finally he argues that the Office of Children's Services (OCS) failed to make active efforts to prevent the breakup of his family.[5]

We conclude that the superior court clearly erred when it found that he had failed to remedy the conditions placing his children in need of aid. We therefore reverse the court's failure to remedy finding, and vacate the termination of the father's parental rights. We remand for the court to reconsider its abandonment findings.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. Initial custody

Ted S. and Justine M. have two children, Casey and Ricky,[6] both Indian children as defined by the Indian Child Welfare Act (ICWA).[7] The children first came into OCS custody in August 2014 after four-year-old Casey was found unsupervised

---

[2] AS 47.10.011(2).

[3] AS 47.10.088(a)(2).

[4] 25 U.S.C. § 1912(f) (2020).

[5] *Id.* at § 1912(d).

[6] We use pseudonyms to protect the privacy of the parties.

[7] 25 U.S.C. § 1903.

outdoors and taken to the police station.[8] Because Ted was incarcerated[9] and neither Justine nor any other adult was available to take care of him, OCS assumed emergency custody of Casey and his younger brother, Ricky. Following a contested hearing in October, the superior court granted OCS temporary custody of the boys, finding them in need of aid due to Justine's neglect and substance abuse and Ted's incarceration.[10] They were returned to Justine's care in December after the court denied OCS's request for continued removal. Both parents later stipulated to adjudication, however, and the boys were removed and placed into foster care in March 2015. After being moved several times, in part due to their significant behavioral issues,[11] the boys were placed into a Native foster home as required by ICWA's placement preferences.[12] Ricky was later moved to a nearby foster home with the daughter of his previous foster parent.

OCS had updated Ted about the boys while he was in prison; he participated in hearings in the children's cases by telephone. Ted was released on probation in 2015 and moved to Washington to be closer to his family, living in a trailer, and later a shed, on his mother's property.

---

[8]    OCS had received previous reports that Casey was often found outside and unsupervised.

[9]    Ted was serving a sentence for attempted sexual assault in the second degree. *See* AS 11.41.420.

[10]    *See* AS 47.10.011(2) (child in need of aid if parent is incarcerated, the other parent is absent or caused child to be a child in need of aid and incarcerated parent has not made adequate arrangements for child).

[11]    The children's foster parents reported that the children were violent and aggressive toward other children. Casey also had an "[e]xtreme fear of water," was "non-verbal," covered his head as if to protect himself when any gestures were made in his direction, and "chronically" fondled his genitals.

[12]    *See* 25 U.S.C. § 1915(b).

### 2. OCS efforts

OCS created case plans for both parents, identifying issues they needed to address and how OCS would assist them.[13] Ted's case plan required him to: (1) follow his probation requirements, including sex offender and substance abuse treatment provided by the Department of Corrections; (2) maintain contact with his children; and (3) develop the parenting skills necessary to care for his special needs children. The assigned OCS caseworker worked with Ted and his probation officer to transfer his probation to Washington so that he could be closer to his family for support and to increase his chances of completing treatment. The caseworker also worked with Ted and his probation officer to modify his probation conditions to allow contact with the boys despite his prohibition from contact with minors. OCS scheduled regular, twice-monthly phone calls with Ted after he moved to Washington and regularly sent him letters; Ted also called OCS periodically.

OCS encouraged Ted to take parenting classes and advised him of classes it believed were available in his area. His caseworker sent him contact information about a class she believed was potentially helpful and available in Washington. She also sent a list of housing authorities and agencies that she found through an internet search. She acknowledged at trial that she later learned only one would provide assistance to individuals like Ted with felony criminal records.

OCS also created a plan for visitation, based on regular weekly phone contact and occasional in-person visits, emphasizing the importance of contacting and talking to his children. Ted was inconsistent in making the calls. The foster parents testified that Ted called every "three to four weeks, sometimes a little bit longer."

---

[13] *See* 25 U.S.C. § 1912(d) (requiring OCS to make active efforts to provide services "designed to prevent the breakup of the Indian family").

Casey's foster parent testified that the longest period of no contact was about "three months." At trial OCS workers testified that Ted blamed the lapses on not having the foster parents' phone numbers or OCS's address. Although he continued to contact Casey, there was also evidence that he had not called Ricky for six months before trial after being rebuked by his foster parent's wife.

In addition to phone calls Ted maintained contact with the boys by sending them gifts. Initially the gifts were "second hand store stuff," but the quality improved over time. And Ted sent a birthday present to Casey right before trial, although he did not send one to Ricky for his birthday.

OCS also arranged several in-person visits in King Salmon in May 2016 and March 2018, in Anchorage in December 2016, and in Dillingham in July 2019. OCS offered other visits, including one in July 2018 when Ted came to Alaska for a court hearing, but citing work obligations and a fear of Justine, Ted declined OCS's offer to pay the change fee so he could stay an extra day and visit with his children. And Ted did not respond to OCS's offer of another visit about a month later.

In addition to its efforts toward Ted, OCS provided services to the children to address their developmental issues. Casey had difficulty speaking and required speech therapy, as well as a one-on-one educational aide for his Individualized Education Program (IEP), so that he could be understood. Ricky similarly required speech therapy and an IEP. Casey and Ricky were also provided occupational and physical therapy.

### 3.    ICPC and proposed trial home visit

After Ted moved to Washington, OCS made a request under the Interstate Compact on the Placement of Children (ICPC) for Washington to conduct a home study and make a placement decision, so that Ted could be reunited with his children. After meeting with the Washington ICPC worker once, Ted missed the next meeting and failed to respond to phone calls and letters. The ICPC was therefore denied in May 2016 and

Ted's file was closed "due to [Ted's] lack of involvement and participation in the process." Additional ICPC requests for members of Ted's family were also denied.

After the Washington ICPC request was denied, OCS offered Ted a trial home visit in King Salmon. OCS arranged for "free housing"[14] for Ted, a job at the local store, and believed that the boys' foster parents and others would help him learn parenting skills. OCS proposed that after three to six months, if the visit went well, Ted and the boys would be able to move to Washington. OCS also believed that even though he was on probation Ted could "easily" move to Alaska and back to Washington. Ted declined OCS's offer because he did not want to lose his long-term job and family support in Washington.

Ted's December 2016 visit with the boys was timed to coincide with mediation in their cases. The parties agreed in mediation that reunification of Ted and the boys was "appropriate as soon as possible once father's housing situation has been addressed." A trial home visit would begin as soon as Ted had housing and an ICPC was accepted. But after he obtained suitable housing no ICPC request was filed.[15]

By the time of the trial in late 2019, OCS had two more ICPCs pending because Casey's foster parent had notified OCS that she did not want to be a permanent placement for him. The pending applications were for Ted's great-grandmother and a cousin.

---

[14] OCS located an apartment that they believed would be rent-free and "that we would be able to use as long as . . . [the occupant] was somebody [with] . . . a bunch of violence in their life at one time or another." OCS's "safety shelter" also "had a home, an apartment, which was coming up empty" that OCS helped [Ted] "qualify to get[.]"

[15] Trial evidence indicated that Ted did not inform OCS about his housing until right before a hearing on his proposed relinquishment of parental rights in 2018.

### B. Proceedings

#### 1. Pre-termination proceedings and related developments

The superior court held a contested permanency hearing in June 2017. In its written permanency findings the court concluded that the children were still in need of aid under AS 47.10.011(1) (abandonment), (9) (neglect), and (10) (substance abuse) because Justine had not remedied the conditions or conduct that led to the boys' removal from her home, and (2) (incarceration) because Ted lived in Washington and did not have an approved ICPC, preventing their return to him. The court found that OCS had made active efforts[16] and that it would not be in the children's best interest to dismiss the case and return them to Ted. The court found that Ted had made "substantial progress" on his case plan and had completed sex offender and substance abuse treatment and obtained steady employment.

OCS filed a petition for termination of parental rights the next month. The petition alleged that the children were still in need of aid due to parental abandonment, neglect, and substance abuse. It also alleged they were "likely to suffer serious physical or emotional damage" if released into Ted's care because he did not have the necessary skills to provide for their basic needs.

In January 2018 Ted notified the caseworker that he was "not really ready" to have the boys with him and that he believed that being adopted by their foster parent was the best thing for the children. But later in the month he emailed OCS and indicated that he did not want to relinquish his parental rights. In February Ted appeared to change his mind again; his attorney set a relinquishment hearing for March. Ted did not

---

[16] Although the court found that OCS's efforts overall were active, it specifically found that its efforts with regard to Ted's housing were "meaningless" because none of the agencies it recommended provided services to convicted felons.

go through with the relinquishment, stating at the hearing that his attorney had not sufficiently explained the relinquishment to him.

The court scheduled another relinquishment hearing for July. Justine relinquished her parental rights and Ted initially indicated that he intended to do the same. He changed his mind after speaking to OCS and the foster parents, however, instead agreeing to a guardianship. After addressing Ted to make sure he understood his rights and what he was giving up, the court entered the guardianship order.

At a status hearing in February 2019 OCS expressed concern that Ted did not seem to understand that guardianship was intended to be a permanent arrangement for the children. The court disagreed, stating that it did not believe that Ted had not understood what his consent to guardianship meant and that it believed he may just have changed his mind.

OCS filed a second termination petition in June 2019. Ted relinquished his parental rights at a hearing a month later. But a week after relinquishing, Ted rescinded his decision. The court scheduled a termination trial for October.

## 2. Termination trial

The termination trial was held over the course of two days, with a two month break in between. OCS's witnesses were social workers from both Alaska and Washington, the children's foster parents, and an expert in child welfare, as required by ICWA. Ted and his girlfriend testified on Ted's behalf.

The Alaska and Washington social workers involved in the ICPC process testified about the process, listed the requested ICPCs, and explained why the ICPCs had been denied. The OCS caseworkers testified about how the children entered OCS custody and the caseworkers' efforts over the course of the case.

The foster parents testified about the children, their progress in therapy, and the boys' contact with their parents. OCS's expert was qualified as an ICWA expert in

child welfare without objection.[17] She testified that returning the boys to Ted posed a substantial risk of physical and emotional harm to them.

The superior court terminated Ted's parental rights in January 2020. It concluded that the children were in need of aid due to Ted's incarceration.[18] The court rejected OCS's argument that the children were also in need of aid due to Ted's abandonment, or due to domestic violence between Ted and Justine.

The court found that Ted had failed to remedy the conduct or conditions placing his children at risk. It concluded that although Ted had complied with his case plan, he had not "remedied the problems that placed the children at risk and gained the necessary skills so that the children can be safely returned to the parent's care." Because Ted's incarceration and resulting unavailability led to the children's entering OCS custody, and because he "continue[d] to be unavailable to his children" by failing to participate in the ICPC home study process, refusing to move to King Salmon for a trial visit, and declining opportunities to visit the children, the court found that Ted failed to remedy the conditions placing his children at substantial risk of harm. The superior court also found that OCS proved beyond a reasonable doubt through the testimony of an expert witness that continued custody of the children by Ted was likely to result in serious emotional or physical damage to the child.

The court then found that OCS made active efforts to reunify the family. It concluded that creating a case plan for Ted, helping to transfer his probation to

---

[17] *See* 25 U.S.C. § 1912(f) (requiring that termination must be supported by "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.").

[18] It also found that the children were in need of aid due to Justine's failure to supervise, her neglect, and her substance abuse, even though Justine had already relinquished her rights.

Washington, requesting ICPCs, coordinating visits by phone and in person, and offering him housing and employment for a trial home visit showed that OCS made active efforts. The court acknowledged that "OCS's efforts were more concentrated during the earlier years of the case," but noted that the reduced efforts occurred after Ted expressed his intent to relinquish his rights, and that visitation was still facilitated. The court found clear and convincing evidence that OCS's efforts as a whole satisfied the active efforts requirement and that the efforts were unsuccessful.

Finally, the court found by a preponderance of the evidence that termination was in the children's best interests. The court determined that the "paramount concern for [the boys was] permanency," given their young age and the length of time they had been in custody. The court acknowledged that returning the children to Ted would also lead to permanency, but the length of time it would take for that transition was too long to be in their best interests due to the time needed for a new ICPC and a transition plan after it was granted.

Ted appeals. He argues that the court erred by finding that he had failed to make adequate arrangements for his children while incarcerated, that he had failed to remedy the conditions placing his children in need of aid, that the record was sufficient to show beyond a reasonable doubt the children would suffer serious harm if placed with him, and that OCS made active efforts.

## III.   STANDARD OF REVIEW

We review for clear error the factual finding that a parent has remedied the conduct or conditions that placed the child at a substantial risk of harm.[19] "Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to

---

[19]     *Eva H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1050, 1052 (Alaska 2019).

the prevailing party below leaves us with a definite and firm conviction that a mistake has been made."[20]

## IV.    DISCUSSION

### A.    It Was Clear Error To Conclude That Ted Failed To Remedy The Condition Causing His Children To Be In Need Of Aid.

To terminate parental rights to a child a court must first find by clear and convincing evidence that the child is in need of aid.[21] Alaska Statute 47.10.011 specifies the bases on which a child may be found to be in need of aid.[22] Having found that the child is in need of aid, the court must then find by clear and convincing evidence that the parent has not remedied the conduct or condition that caused the child to be in need of aid.[23] Here, the court found that the children were in need due to Ted's incarceration and failure to make adequate arrangements for the children. There was no other basis on which the court found them in need of aid with respect to Ted.

Ted was released from prison in 2015. This remedied the condition that placed the children in need of aid with regard to Ted.[24] The superior court nevertheless concluded that he had not remedied the conduct or conditions that caused Casey and Ricky to be in need of aid because he had not "gained the necessary skills so that the children [could] be safely returned to [his] care." The court found that the children came

---

[20]    *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 949 (Alaska 2013).

[21]    AS 47.10.088(a).

[22]    AS 47.10.011.

[23]    AS 47.10.088 (using conjunction "and").

[24]    Because the children had been taken into OCS custody, arrangements for their care were no longer inadequate as they had been with Justine.

into OCS custody based on Ted's incarceration and resulting unavailability to care for them, and that Ted "continue[d] to be unavailable to his children," which "place[d] the children at substantial risk of mental and emotional injury." This was improper.

The superior court's reliance on *Barbara P. v. State, Dep't of Health & Social Services*[25] appears to have led to its error. In *Barbara P.* we upheld the termination of parental rights, concluding that an addicted mother's completion of her case plan did not guarantee a finding that she had remedied her conduct because the proper question was "whether she had remedied the problems that placed her children at risk and gained the necessary skills so that the children could be safely returned to her care."[26] We concluded that even though the mother had completed substance abuse treatment, she had not demonstrated that she was able to maintain sobriety or had developed the skills needed to care for her children — skills that she had not learned due to her addiction.[27]

But this case is not like *Barbara P.*: there are no parenting "skills" that must be developed to get out of prison. One must simply be released in order to remedy one's incarceration.

Even if *Barbara P.* were applicable, the analysis is improper. When the alleged CINA ground is incarceration, the statute requires that the court determine whether a parent is currently incarcerated; it does not require the court to evaluate any

---

[25]     234 P.3d 1245 (Alaska 2010).

[26]     *Id.* at 1260 (affirming failure to remedy finding after deferring to superior court's belief that Barbara "had not 'internalized what she ha[d] learned and there [was] no real assurance that [she would] not fall back into her old dysfunctional ways' ").

[27]     *Id.* at 1260-61.

additional factors.[28] Although consideration of why a parent was unavailable to care for a child may be relevant when abandonment[29] — a CINA ground which the court explicitly rejected here — is at issue, the court's findings concerning "unavailability" are irrelevant to whether Ted was released from incarceration, and should not have been the basis of a failure to remedy finding.

OCS's argument that the superior court properly considered Ted's unavailability because it may make a failure to remedy finding based upon "any fact relating to the best interests of the child" is similarly misplaced.[30] A court's finding may not be based on *any* fact; the factors it considers must be related to the conditions that rendered the child in need of aid.[31] Ted's "unavailability" is not relevant to the statutory factor of incarceration; it was error to consider it.

---

[28] *See* AS 47.10.011(2) (incarceration).

[29] AS 47.10.013 (detailing statutory grounds for finding abandonment); AS 47.10.011(1) (abandonment).

[30] *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 74 P.3d 896, 902 (Alaska 2003); AS 47.10.088(b) ("[A] court may consider any fact relating to the best interests of the child [when making a failure to remedy finding], including (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs; (2) the amount of effort by the parent to remedy the conduct or the conditions in the home; (3) the harm caused to the child; (4) the likelihood that the harmful conduct will continue; and (5) the history of conduct by or conditions created by the parent.").

[31] Alaska Statute 47.10.088(a)(1) does not use an article when describing "conduct or conditions." But AS 47.10.088(a)(2) does use the specific article "the" when referring to "the conduct or conditions" that were not remedied. Alaska Statute 47.10.088(a)(2)'s conduct and conditions language must be understood to refer back to the conduct and conditions in AS 47.10.088(a)(1). Therefore, the conditions to be remedied must be those the court found the children were subjected to and that rendered them in need of aid.

Because "unavailability" may be relevant to abandonment, however, we remand this matter to the superior court to reconsider its findings in relation to OCS's abandonment argument and petition. The court found Ted "unavailable" because he had failed to obtain a suitable home for himself and the boys and he declined visits with them. But it concluded that OCS had not proven Ted had abandoned them.

The superior court analyzed this issue using a two-part common-law test we relied upon in the past, considering whether the parent's conduct evidences a willful disregard for his parental obligation and whether that conduct led to the destruction of the parent-child relationship.[32] We developed this test long ago, before there was a statutory definition of abandonment.[33]

But we recently clarified that a court considering a child in need of aid case should apply the current statutory definition of abandonment and the examples found in AS 47.10.013(a).[34] Under that statute, a court may find abandonment of a child if a parent "has shown a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering the child's age and need for care by an adult."[35] Abandonment also includes instances when the parent, acting without justifiable cause "has made only

---

[32]    *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs..* 251 P.3d 330, 335 (Alaska 2011).

[33]    *See D. M. v. State*, 515 P.2d 1234, 1237 (Alaska 1973).

[34]    *See Steve H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 444 P.3d 109, 113 (Alaska 2019).

[35]    AS 47.10.013(a).

minimal efforts to support and communicate with the child; [or] failed for a period of at least six months to maintain regular visitation with the child . . . ."[36]

In this case, the superior court made detailed factual findings that would be relevant to this statutory definition.[37] On remand, if the superior court concludes that OCS has established that the children are in need of aid because Ted abandoned them,[38] then it should consider whether Ted has failed to remedy this conduct.[39] The superior court's findings about Ted's unavailability are relevant to this issue.

## V. CONCLUSION

We REVERSE the superior court's finding that Ted failed to remedy the conduct that caused Casey and Ricky to be in need of aid and VACATE the termination of Ted's parental rights.

We REMAND for reconsideration of the court's abandonment findings. The superior court is authorized to convene any further proceedings it deems necessary.

We do not retain jurisdiction.

---

[36] AS 47.10.013(a)(2)-(3).

[37] We are not persuaded by OCS's argument that we should affirm the superior court's termination order on the basis it specifically rejected.

[38] AS 47.10.011(1).

[39] AS 47.10.088(2).