NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| MICHAEL F., ) | |
| ) | Supreme Court No. S-18718 |
| Appellant, ) | |
| ) | Superior Court Nos. 3AN-21-00032/ |
| v. ) | 00149 CN (Consolidated) |
| ) | |
| STATE OF ALASKA, DEPARTMENT ) | MEMORANDUM OPINION |
| OF FAMILY AND COMMUNITY ) | AND JUDGMENT* |
| SERVICES, OFFICE OF CHILDREN'S ) | |
| SERVICES, ) | No. 2022 – March 27, 2024 |
| ) | |
| Appellee. ) | |
| ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Una S. Gandbhir, Judge.

Appearances: Monique Eniero, Anchorage, for Appellant. Laura Fox, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

## I.    INTRODUCTION

A father appeals the termination of his parental rights. He challenges the superior court's findings that his daughters were in need of aid due to abandonment,

---

\*      Entered under Alaska Appellate Rule 214.

domestic violence, and neglect, as well as its finding that termination of parental rights was in the children's best interests. Because the record supports the superior court's findings that the children are in need of aid due to abandonment and that termination of parental rights was in their best interests, we affirm the termination of his parental rights.

## II. FACTS AND PROCEEDINGS

Michael and Jessica have two children together: Amber, born in 2019, and Alice, born in 2021.[1] Michael was previously married to Jessica's sister with whom he also has children who were the subject of a separate child in need of aid case. Jessica was about seventeen and a half years old when she gave birth to Amber; Michael was 30 years old.

### A. Facts

In September 2020, Michael was arrested and charged with assaulting Jessica. Despite a condition that he have no contact with her, Michael contacted Jessica from jail.[2]

That same month, OCS received a report that Michael was violent with Jessica while she was with Amber. OCS investigated and Jessica told the caseworker that while she was living with Michael and her older sister, Michael sexually abused her and her twin sister, starting when the girls were twelve years old. OCS referred Jessica to two organizations that work with victims of domestic violence and sexual assault. Jessica obtained a short-term domestic violence protection order against Michael and OCS closed its investigation.

---

[1] We use pseudonyms for all family members to protect the family's privacy.

[2] Michael eventually pled no contest to a misdemeanor domestic violence assault.

Later that year OCS received another report of domestic violence between Michael and Jessica. The report alleged that Michael and Jessica had gotten into an argument and that Michael left with Amber in the car and threatened to drive off a cliff. When OCS investigated the report, Jessica acknowledged she was back together with Michael.

OCS developed an in-home safety plan, requiring that Jessica move in with her parents, who would supervise her with Amber at all times. The caseworker created a case plan for Jessica and again referred her for domestic violence and sexual assault services. The caseworker and Jessica reported Michael's continued contact with Jessica to Michael's probation officer, and Michael was arrested for violating conditions of release.

### B. Proceedings

#### 1. Early proceedings

In February 2021, OCS filed a non-emergency petition for temporary custody but left Amber in Jessica's care under an in-home safety plan. The petition alleged that, based on the violence between Michael and Jessica and Jessica's statements that Michael had sexually abused her, Amber was in need of aid for four reasons: risk of substantial physical harm,[3] risk of sexual abuse,[4] risk of mental injury from domestic violence,[5] and neglect.[6]

The caseworker tried to meet with Michael after filing the petition, but Michael missed those appointments. The caseworker and her supervisor created an initial case plan for Michael to learn to control his violent impulses and to meet Amber's needs.

---

[3]     *See* AS 47.10.011(6).

[4]     *See* AS 47.10.011(7).

[5]     *See* AS 47.10.011(8).

[6]     *See* AS 47.10.011(9).

After the case was reassigned to a new caseworker, the caseworker made a home visit to Jessica's parents' home and discovered that Jessica and Amber were not there. Jessica's parents did not know where they were, in violation of the safety plan that required them to continuously supervise Jessica and Amber. OCS removed Amber.

In March, based upon the parents' stipulation, the court adjudicated Amber a child in need of aid. OCS scheduled separate team decision-making meetings for Jessica and Michael. The OCS caseworker leading the meeting encouraged Michael to meet and work with the assigned caseworker, but Michael responded that it did not matter if he met with that caseworker because "talks would start falling off" regardless of any efforts he made. Michael also stated that he was not interested in services to help him address the issues in his case plan.

Michael met with the caseworker and her supervisor for a case planning meeting. In addition to the requirements in the original case plan, the updated one required Michael to participate in individual counseling to address domestic violence, complete an integrated psychological and sex offender risk assessment, work with OCS, attend court hearings, complete parenting and domestic violence classes, and attend visitation. Michael signed the case plan but noted that he did not agree to anything except visitation. Michael did not attend any more appointments with the caseworker.

In late March, Jessica gave birth to Alice. In April, OCS removed Alice from the home after investigating another report on the family. OCS then filed an emergency petition to adjudicate Alice in need of aid and for temporary custody.

Following a hearing in May, the court adjudicated Alice a child in need of aid and found that removal was warranted. A third caseworker was assigned after the hearing.

That caseworker contacted Michael repeatedly and set up three case plan meetings; Michael attended one meeting and missed the other two. At the meeting in October, Michael told the caseworker he did not believe he needed any services and refused to sign releases of information for referrals.

The court held an adjudication and disposition hearing later that month and found both girls in need of aid based on the domestic violence between their parents.[7] The court cited Michael's history of domestic violence and unwillingness to engage in services as well as Jessica's "situation as a victim . . . and her pattern of being unable to take consistent steps to protect herself or engage in services." It also found that OCS had been making reasonable efforts to reunify the family and that it was contrary to the children's welfare to return home.

Later that month, Jessica emailed the caseworker because she wanted to dissolve the no contact order with Michael. Jessica told the caseworker that when she said that Michael abused her, she was being influenced by her sister, who wanted Jessica's help with her separate case involving Michael and their children. Jessica wrote that she wanted to retract her statement so that she and Michael could raise Amber and Alice together. The caseworker declined to help dissolve the order because OCS had additional information that domestic violence was taking place between the couple.

In early 2022, the caseworker was able to meet with Michael following unsuccessful attempts in November and December. Michael told the caseworker that he had not understood that he needed to engage in services to have the children returned. He told her that he now understood the requirement and agreed to engage in services. The caseworker again referred Michael for therapy to address domestic violence and Michael signed a release of information for a sex offender risk assessment. Michael did not, however, complete the assessment; the caseworker later testified that Michael told her it "would not look good for him" to do a sex offender risk assessment.

In April, Michael reported to the caseworker that he was being "consistent with [his] [parenting] classes." He also informed the caseworker that he was

---

[7]     *See* AS 47.10.011(8).

participating in therapy on a weekly basis. But Michael had not been consistent with his classes or with therapy.

At some point in the spring of 2022, Michael and OCS participated in mediation about what services should be required but were unable to reach an agreement. Following the mediation, Michael offered to do a sex offender risk assessment without a release of information to OCS; OCS declined the offer. The caseworker also again referred Michael to parenting services.

### 2. Termination petition and trial

OCS filed a petition to terminate Michael's and Jessica's parental rights in July 2022; trial took place over two days in January 2023. OCS called four witnesses: the children's most recent foster parent, and the three caseworkers who had been assigned to the case. OCS also introduced evidence of Michael's misdemeanor assault conviction against Jessica in 2020. Neither Michael nor Jessica presented any witnesses.

The first caseworker recounted Jessica's allegations that Michael had sexually abused her as a minor and been violent with her in their relationship. Michael objected to admission of the hearsay statements. The court agreed that it was hearsay as it related to Michael and could not be relied on for the truth of the matter asserted against him.[8] But the court noted that the information was allowed to explain why OCS included certain issues in Michael's case plan, because "otherwise it[] is just case plans in a vacuum." The first caseworker also testified that Michael had missed appointments to case plan with her.

The second caseworker described the circumstances around Amber's removal after discovering that Michael, Jessica, and Amber had been seen together in violation of Amber's in-home safety plan. The caseworker also testified about

---

[8] The court ruled it was not hearsay with respect to Jessica. *See* Alaska R. Evid. 801(d)(2) (admission of party opponent).

Michael's refusal to agree to or participate in activities listed in his case plan during the one case plan meeting he attended with her. The caseworker testified that Michael continued visits with Amber and Alice, but that he attended no further appointments with her.

The third caseworker testified about Michael's general refusal to engage in case planning meetings. She further noted that while Michael had signed releases of information for individual counseling and a sex offender assessment at a case planning meeting in May, he later refused to do them because "he [did] not believe that he is in need of services." She also recounted Michael's reports that he was consistently attending his classes and therapy sessions beginning in April. The caseworker testified, however, that the parenting class records indicated that Michael began taking classes only in July, after she had scheduled an intake appointment for him. She also testified that Michael's counseling records showed he had attended only five therapy sessions: two in March and one a month in April, June, July, and August. The caseworker testified that Michael missed multiple counseling appointments. She also testified that Michael completed a twelve-session parenting class and attended but did not complete "healthy relationships" classes after OCS filed the termination petition.

Finally, the caseworker testified that Amber was interviewed at a child advocacy center based on concerns she was displaying sexualized behaviors. She reported that Amber said a "monster" had hurt her. Over Michael's objection, the superior court allowed the caseworker's testimony about Amber's statements to show OCS's reasonable efforts to engage Amber in therapy.

The superior court terminated Michael's parental rights.[9] It found by clear and convincing evidence that Amber and Alice were in need of aid under

---

[9]    The superior court reserved its ruling on termination of Jessica's rights to allow her to sign and file a relinquishment of her parental rights, which she did in December.

AS 47.10.011(1), (8), and (9) "[b]ased on the evidence that [OCS] presented, including the credible testimony of OCS caseworkers."

The superior court found that Michael abandoned the children under AS 47.10.013.  It found that Michael "failed to participate in a suitable plan or program designed to reunite him with [Amber] and [Alice]" and that he had "minimally engaged" in and did not comply with his case plan.  The court noted Michael's offer to participate in a sex offender assessment, although without providing a release of information, but found that he had not acknowledged or engaged in services to address the behavior that led OCS to take custody of the children.  It also found that except for "spending time with his girls," Michael had not taken "any other significant steps" to address the issues in his case plan.[10]  The court also found that Michael had "not provided basic support for the children" and had therefore "shown a conscious disregard of parental responsibilities" towards Amber and Alice.

The court also found that the girls were at substantial risk of mental injury as a result of domestic violence between their parents under AS 47.10.011(8)(B)(ii).  The court repeated its ruling that Amber's statements about a "monster" were admissible.  The court also stated that it could consider and rely on those statements when it considered OCS's efforts to reunite the family.  Finally, the court found that "conduct and conditions created by [Michael] have subjected [Amber] and [Alice] to neglect."

The superior court recognized that Michael had consistently visited his daughters and that the visits went well.  But it found by clear and convincing evidence

---

[10]     *See Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.* (*Sherman B. II*), 310 P.3d 943, 950 (Alaska 2013) ("Abandonment may also be found if the parent, without justifiable cause, 'failed to participate in a suitable plan or program designed to reunite the parent . . . with the child.' " (quoting AS 47.10.013(a)(4))).

that he had not remedied the conduct or conditions that endangered the children, or the additional concerns that had arisen while they were in OCS custody.

The court also found that OCS had made reasonable efforts to reunify Michael and his daughters, but that "his behavior and [lack of] engagement" showed he was only making a "cursory" effort to comply with his case plan. As a result, it found that further OCS efforts were unlikely to be "fruitful."

After noting that Michael "has not shown that [he] is even close" to demonstrating he was able to have the girls returned to his care, the court found that the girls' need for "permanency, stability, and support" required termination of his parental rights. It found by a preponderance of the evidence that termination was in their best interests.

Michael appeals, arguing the court clearly erred by finding the children in need of aid due to abandonment under AS 47.10.011(1), risk of mental injury from domestic violence under AS 47.10.011(8)(B)(ii), and neglect under AS 47.10.011(9). He also argues that it clearly erred by finding that termination of his parental rights was in the children's best interests.[11]

## III. STANDARD OF REVIEW

Whether a child is in need of aid and whether termination is in a child's best interests are factual determinations that we review for clear error.[12] "Findings of fact are clearly erroneous if a review of the record in the light most favorable to the

---

[11] The superior court granted Michael's motion to stay the termination order pending appeal, allowing him to continue regular visitation with his daughters.

[12] *Sherman B. II*, 310 P.3d at 948-49 (first citing *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 270 (Alaska 2011); then citing *Christina J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 254 P.3d 1095, 1103-04 (Alaska 2011); then citing *Thea G. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 291 P.3d 957, 962 (Alaska 2013); and then citing *Hannah B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 289 P.3d 924, 930 (Alaska 2012)).

prevailing party . . . leaves us with a definite and firm conviction that a mistake has been made."[13] Conflicting evidence is generally insufficient to overturn the superior court's decision, and we will not reweigh evidence when the entire record provides clear support for the superior court's ruling.[14]

## IV. DISCUSSION

### A. The Superior Court Did Not Clearly Err By Finding That The Children Were In Need Of Aid Due To Abandonment.

Michael argues that the superior court clearly erred when it found that Michael abandoned the children by failing to provide basic support for them and by minimally engaging with his case plan. He relies on a common-law test for abandonment.[15] But we have clarified that we apply the "statutory rule governing abandonment" as set out in AS 47.10.011(1) and AS 47.10.013(a), not a common-law test.[16]

Under AS 47.10.013(a), abandonment occurs when a parent "has shown a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering the child's age and need for care by an adult." The statute lists eight specific instances of abandonment[17] and a finding of any one of them is sufficient to establish abandonment.[18] Subsection (a)(4) defines abandonment as a parent's failure,

---

[13] *Id.* at 949 (quoting *Pravat P.*, 249 P.3d at 269-70).

[14] *Id.* (quoting *Hannah B.*, 289 P.3d at 930).

[15] *See Jeff A.C., Jr. v. State*, 117 P.3d 697, 704 (Alaska 2005).

[16] *Steve H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 444 P.3d 109, 113 (Alaska 2019).

[17] AS 47.10.013(a)(1)-(8).

[18] *Trevor M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 368 P.3d 607, 610 (Alaska 2016) (citing *Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1112 (Alaska 2010)).

"without justifiable cause . . . to participate in a suitable plan or program designed to reunite the parent . . . with the child."

We have cautioned that the failure to participate must be substantial. "While [AS 47.10.013(a)] does not necessarily require a parent to follow his or her reunification plan to the letter, it does require more than minimal participation."[19] And we have recognized that "communication with OCS and compliance with the case plan's reasonable requirements were necessary to build a relationship" between a parent and child to allow the child's return.[20]

The record supports the superior court's finding that Michael abandoned Amber and Alice. Michael did not believe he needed services and refused to engage in case planning, participate in services, or provide OCS with releases of information to determine if he was addressing the issues that brought the children into custody. Because Michael's older children had also been in OCS custody, he should have been aware of what he needed to do to regain custody of his children. Yet Michael did not participate in any services or engage in case planning until early 2022, a year after OCS filed its petition for temporary custody of Amber. At the time of trial, Michael's year-long delay spanned more than a third of Amber's life and nearly all of Alice's.

---

[19] *Sherman B. II*, 310 P.3d 943, 950 (Alaska 2013) (alteration in original) (quoting *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 951 (Alaska 2000)).

[20] *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.* (*Sherman B. I*), 290 P.3d 421, 429-30 (Alaska 2012) (affirming abandonment finding where father only attended supervised visits and minimally complied with aspects of his case plan which included providing urinalyses, providing basic contact information, and completing parenting assessment); *see also Dale H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 235 P.3d 203, 210-11 (Alaska 2010) (affirming abandonment finding where father did not participate in urinalysis program after one negative test result, failed to contact OCS for six months, and failed to complete state-approved domestic violence intervention program).

Michael also repeatedly lied to OCS about his participation in classes and therapy. His April 2022 claim that he was "consistent with my classes" was contradicted by class records showing that he only began taking classes in July after the caseworker scheduled an intake appointment for him. Michael told the caseworker in April that he was participating in weekly therapy but the records showed he attended only six sessions from March to August 2022. And despite agreeing to sign a release of information for a sex offender risk assessment, Michael had not yet done the assessment by the time of trial.

The evidence presented at trial supports the superior court's finding that Michael failed to participate in a suitable plan or program designed to reunite him with Amber and Alice. The superior court did not clearly err in concluding that Amber and Alice were children in need of aid due to abandonment under AS 47.10.011(1).[21]

### B. The Superior Court Did Not Clearly Err By Finding That Termination Of Parental Rights Was In The Children's Best Interests.

Michael also argues that termination of his parental rights was not in the children's best interests because it "did not appropriately consider the strong bond" between Michael and the children. He argues that his regular weekly visits were

---

[21] To the extent that the superior court relied on Michael's failure to provide reasonable support to Amber and Alice in concluding that Michael abandoned them, it committed legal error. Once a child is in OCS's custody, parents retain only the responsibility to provide child support and reasonable visitation. *See* AS 47.10.084(c) (noting parents retain "responsibility for support" and "reasonable visitation"); *Duke S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1127, 1134 (Alaska 2018) (same).

Because only one statutory basis is necessary to find children to be in need of aid in a termination proceeding, we need not address the superior court's other CINA findings. *See Casey K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 311 P.3d 637, 643 n.14 (Alaska 2013) (citing *G.C. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 67 P.3d 648, 651 (Alaska 2003)).

"unquestionably positive," and that he used his visitation time to foster Amber's and Alice's relationships with their extended family.

When deciding if termination of parental rights is in children's best interests, the superior court "may consider any fact relating to the[ir] best interests . . . including but not limited to" the factors listed in AS 47.10.088(b),[22] and the court is not bound to "accord a particular weight to any given factor."[23] The court expressly considered Michael's relationship with his daughters. It recognized that Michael was "interested in spending time with his girls," but it also expressly stated that it was not deciding whether he "loves the girls" or "wants to parent them." The court focused instead on the fact that "[a]fter two years of [the girls] being in [OCS's] custody [Michael] has not shown that he's even close to being able to have them returned to his care," citing his failure to address any aspect of his case plan besides visitation and his near-total lack of engagement with OCS. The court concluded that because Amber and Alice "need . . . permanency, stability, and support . . . in order to thrive," termination was in their best interests.

The superior court exercises broad discretion to weigh factors it considers relevant based on the circumstances of the children before it.[24] The court heard evidence of Michael's almost complete failure to address any of the reasons his very young daughters entered OCS custody. Given their young ages and need for permanency and stability as well as Michael's failure to work with OCS to reunify with his daughters, the court concluded that termination was in the girls' best interests. The court did not clearly err.

---

[22] *Shirley M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 342 P.3d 1233, 1243 (Alaska 2015).

[23] *Id.* (citing *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1263 (Alaska 2010)).

[24] *See id.*

## V. CONCLUSION

We AFFIRM the termination of Michael's parental rights.